### RUDOLPH WURLITZER COMPANY *v.* AARON COHEN ET AL.

[No. 57, October Term, 1928.]

*Decided January 25th, 1929.*

The cause was argued before BOND, C. J.; PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Reuben Oppenheimer,* with whom were *Howard E. Heckler* and *Emory, Beeuwkes, Skeen & Oppenheimer* on the brief, for the appellant.

*Charles Markell* and *S. Ralph Warnken,* for the appellees.

ADKINS, J., delivered the opinion of the Court.

The appellees, Aaron Cohen, Michael Hartz, and Joel Gebhart, on the 6th day of September, leased the land and improvements on the south side of Baltimore Street, known at that time as the Victoria Theater, unto Nixon's Victoria Theater Company, Inc., for a term of ten years, beginning on Oct. 1st, 1916, at and for a yearly rental of $16,000. In the lease it was expressly agreed, among other things, "that all additions and alterations made to said premises and all fixtures (save office fixtures, signs and moving picture machines installed by the tenant Nixon) should belong to the landlords at the end of the term." This lease was duly recorded among the Land Records of Baltimore City.

Later, on June 6th, 1922, an agreement was entered into by the lessors and Nixon's Victoria Theater Company, Inc., and Fred S. Nixon-Nirdlinger, which was also recorded among the Land Records of Baltimore City. In this last agreement Nirdlinger joined so as to be bound as principal and not as surety on the personal covenants contained therein, as well as in the lease aforesaid, and by that agreement, the term of the lease was extended until and including Sept. 30th, 1932, and it was agreed and covenanted therein, "that when the lease or this renewal shall expire, everything on said demised premises shall become the property of and belonging to the then landlords."

On November 13th, 1925, another agreement was made

between the same parties, and it too was recorded among the Land Records of Baltimore City. In it was stated that the tenants proposed to sublease the property and permission was thereby given the Nixon Victoria Theater Company, Inc., and Fred S. Nixon-Nirdlinger by the lessors to make certain improvements named therein to the leased property, and, if the Nixon Victoria Theater Company, Inc., and Fred S. Nixon-Nirdlinger desired "to put in said premises another organ in lieu of the present organ," they were permitted to do so, but if the alterations and improvements were made, they were to "be and immediately become the property of the landlords, including any organ substituted for the present organ."

The demised property was, on the same day, subleased by Nixon's Victoria Theater Company, Inc., to one Lewis Berman, for the remainder of the lease, as extended, which was likewise duly recorded among the Land Records of Baltimore City, in which sublease is found this provision: "There is now an organ on said demised premises and it is agreed that if another organ should be put in said demised premises in lieu of the present organ, that the organ as substituted shall belong to the owners * * * of the building upon the completion of the lease."

Thereafter, as alleged in the answer of the Nixon Victoria Theater Company, Inc., Berman assigned the sublease to the Embassy Theater Corporation, of which he was president. This last named company failed to pay the rents due under said sublease, and, on the 5th day of August, 1926, Nixon's Victoria Theater Company, Inc., re-entered and took possession of the theater and, on the same day, subleased it to the American Theater Corporation. In the sublease of the property by Nixon's Victoria Theater Company, Inc., to the American Theater Corporation, it was agreed that "all additions and alterations that were permitted to be made by the owners thereof, on the demised property and all fixtures (save office fixtures, signs and moving picture machines, installed by said sublessee) should belong to the owners of the building at the end of such sublease." The sublessee further cove-

nanted and agreed "to be bound by all the terms and conditions contained in the original lease of said theater from Aaron Cohen and others, landlords to Nixon's Victoria Theater Company, Inc.," and the agreement extending said lease, as well as the additional agreement executed on the 13th day of November, 1925, between the said Aaron Cohen and others and Nixon's Victoria Theater Company, Inc., and Fred S. Nixon-Nirdlinger, which said agreement was duly recorded among the Land Records of Baltimore City, but it was further agreed therein that the sublease should not be construed to permit the American Theater Corporation to make any alterations or changes in, about, or upon said demised premises without the written consent of the said Nixon's Victoria Theater Company, Inc., and said Fred S. Nixon-Nirdlinger.

After the lease of the theater to Berman on the 13th day of November, 1925, extensive improvements were made to the theater building by Berman, or the Embassy Theater Corporation, of which he was president, and among the improvements made was the installation of a new organ. This organ was installed under an agreement in the nature of a lease or conditional contract of sale, dated the 25th day of November, 1925, between the Independent Theater Company, of which Berman was likewise president, for and on behalf of the Embassy Theater Corporation and the Rudolph Wurlitzer Company, the appellant in this case, by the terms of which the title to the organ was to remain in the Rudolph Wurlitzer Company, from whom it was obtained, until the installments mentioned in the agreement were all paid, with the right of the last named company to repossess the organ upon default of the other party to the agreement to pay any of said installments or charges provided for in the contract, when and as the same became due and payable. This agreement or paper, in which the organ was fully described, was recorded on April 7th, 1926, among the Chattel Records of Baltimore City.

The Independent Theater Company, or the Embassy Theater Company, for whom the organ was obtained, defaulted in the payment of the installments provided in said agree-

ment, and the appellees, claiming ownership of the organ under the terms of their lease, upon hearing that the appellant was about to retake and repossess the organ and remove the same from the leased premises, filed their bill asking that the defendant, the Rudolph Wurlitzer Company, or the other defendants named in the bill, be enjoined from removing the organ from the demised premises. Upon this bill the court granted a preliminary injunction. Thereafter Nixon's Victoria Theater Company, Inc., the Embassy Theater Corporation, the Independent Theater Corporation, the American Theater Corporation, and the Rudolph Wurlitzer Company answered, and the last named corporation moved that the injunction be dissolved. Fred S. Nixon-Nirdlinger, Louis Berman, and the American Seating Company were not summoned. Thereafter a decree was granted overruling the motion to dissolve the injunction, and granting a perpetual injunction against the Rudolph Wurlitzer Company and the other defendants who had answered the bill. From that decree the Rudolph Wurlitzer Company alone appealed to this Court.

We have carefully examined the record and all of the numerous authorities cited by counsel, and others which we have found. Our conclusion is that the decree appealed from must be reversed.

1. Aside from any effect the terms of the lease from the landlord to the tenant may have upon the question, the organ did not become a fixture when it was placed in the theater. None of the tests indicated in *Dudley v. Hurst*, 67 Md. 44, and in later cases, including *Solter v. MacMillan*, 147 Md. 580, are met.

(a) The organ was not actually or constructively attached to the realty. The uncontradicted testimony shows that the alterations in the theatre, including the removal of the boxes, were made without regard to the purchase of a new organ, and that the laying of the foundation and the arrangement for connecting pipes were at the expense and under the direction of the tenant. When the organ was delivered, it rested on a floor frame which was set on strips which had

been nailed by the tenant's superintendent to the floor of the chamber that had been provided. On the frame the chests were set and in the chests were the pipes. The organ can be removed without in any way damaging the premises, by lifting the pipes out and passing them through the door, or by lifting out the movable grill which was placed there for that purpose. The organ is not fastened to anything that would have to be torn apart. The pipes which lead to the organ were not installed by the Wurlitzer Company, but by the purchaser of the organ, and are not the property of the Wurlitzer Company. The platform on which the organ rests is about an inch and a half thick and, according to the weight of the testimony, is not spiked or nailed to the floor. The only witness that testified that it was in any way fastened to the floor said it was screwed to the underlying strips.

(b) The organ is not peculiarly adapted to the use of the theatre in the sense that it would not be equally useful elsewhere, or that it could not be replaced by any ordinary pipe organ of approximately the same size. The new organ and the old one were about the same in bulk. There was more space provided for the new organ than was needed or asked for. As said above, the changes made in the theatre were not made primarily for the purpose of providing a place for the organ. By the terms of the lease the changes were permitted without regard to whether the tenant subsequently elected to purchase a new organ or not, and under the permission to make these changes the tenant spent from $70,000 to $100,000, according to the opinion of one of the landlords, and about $150,000 (including the new organ) according to the witness who had charge of the work for the tenant, in improvements which ultimately were to become the property of the landlord.

(c) It is clear from the provision of the conditional sale contract between the tenant and the vendor of the organ, and all the testimony in the case, that it was not the intention of the party making the annexation to make the organ a permanent accession to the freehold. "Of those tests the most

important is the question of intention." *Dudley v. Hurst, supra.*

In support of the proposition that the organ is not a fixture, see *Abramson v. Penn*, 156 Md. 186, where the question was between the conditional vendor and a purchaser of the real estate for value without notice. Even in such a case, when the radiators rested upon brackets screwed to the wall of the building and were connected with a gas supply pipe belonging to the owner of the building, it was held that the radiators were net fixtures. *A fortiori*, the organ is not a fixture, where a purchaser of the real estate is not involved. In our opinion, apart from the agreement in the lease, the organ would, at the termination of the lease, remain the property of the lessee, if the question of ownership were between the lessor and lessee alone, even without invoking the doctrine applicable to trade fixtures.

2. As to the conditional vendor, even if the organ could be considered as a fixture, the provision of the lease, that property subsequently acquired by the tenant should at the termination of the lease become the property of the lessor, does not give the lessor a claim as against the conditional vendor, unless the fact that an old organ which belonged to the lessor was taken by the conditional vendor, and a credit given by it to the tenant by reason thereof, is to control. The author of the note in 37 *L. R. A.* (N. S.), 119, says: "The preponderance of authority is to the effect that where the removal of the fixture will not materially injure the premises, a seller thereof retaining title thereto may assert his right as against a prior mortgagee of the realty." And the author calls this the modern equitable rule as distinguished from the so-called Massachusetts rule to the contrary. The author also says: "The fact that a prior mortgage of real estate contains a provision that it shall cover additions thereto does not give the mortgage a superior claim to chattels annexed thereto as against the vendor by conditional sale contract, since the after acquired property clause in a mortgage attaches only to such interest as the mortgagor acquires," citing a number of cases in support of that view and a few cases

to the contrary. The reason for the preponderant view, as expressed in one or more of them, is that the title to the chattel never vested in the purchaser; and that it therefore was not acquired by the mortgagee.

And in 26 *C. J.*, page 689, sec. 60, in an article on fixtures, of which Mr. Herbert T. Tiffany is the author, it is said: "As against a lessor of land, an agreement reserving the right of removal in favor of a person selling articles to the lessee has been held to be effective, and the fact that the lease provided that all improvements should belong to the lessor * * * has been regarded as immaterial in this respect"; and in 24 *R. C. L.*, page 475, sec. 769: "It is the general rule that where a mortgagor of real estate purchases chattels, such as machinery, under a contract whereby the seller retains the title until the price is paid, and annexes such chattel to the realty in such a way that as between himself and his mortgagee the chattel becomes a part of the realty and covered by the mortgage, yet if the annexation is in such way that the chattel may be removed without injury to the realty, this will not enable the mortgagee to claim the same under his mortgage as against the seller; and the fact that the mortgage contains an after acquired property clause is held immaterial." See also *Brady v. Johnson,* 75 Md. 445, 455; *Holt v. Henley,* 232 U. S. 637; *Detroit Steel Cooperage Co. v. Sisterville Brewing Co.,* 233 U. S. 712; *Ratchford v. Cayuga County Cold Storage & Warehouse Co.,* 217 N. Y. 565; *Davis v. Bliss,* 187 N. Y. 77; *Ridgeway Dynamo & Engine Co. v. Werder,* 287 Pa. 358; *Marinette Iva Works Co. v. Cody,* 108 Mich. 381; *Hart v. Appalachian Washed Coal Co.,* 139 Tenn. 204; *Standard Dry Kiln Co. v. Ellington,* 172 N. C. 481; *Wood v. Holly Mfg. Co.,* 100 Ala. 326; *Defiance Machine Works v. Trisler,* 21 Mo. App. 69; *Best Mfg. Co. v. Cohn,* 3 Cal. App. 657; *In re Frederica Water, Light & Power Co.,* 10 Del. Ch. 362.

3. Under the circumstances of this case, the taking of the old organ by the conditional vender did not put the lessor in the position of a purchaser for value. The vendor did not remove the old organ from the organ chamber. That was

done by the tenant. According to the undisputed testimony, "the old organ, which had been placed in the Embassy Theatre had not been nailed or screwed to the floor in any way at the time it was installed," and there is no testimony to show that it was ever attached to the building in any way. It was eight or nine years old. In the written agreement between the Wurlitzer Company and the tenant there is an acknowledgment of receipt by the vendor of "the sum of $7,000 allowance on the old organ and the sum of $1200 cash on the execution of the agreement." It was explained, however, without objection, by oral testimony in behalf of the vendor, that "the old organ had been sold to Mr. Brodie for $2,100, and a credit had been given * * * for the proceeds of the sale. A credit of $7,000 had been allowed on the contract for the new organ, representing the proceeds of the old organ, and a discount of $5,000 on the price of the new organ. Mr. Berman had bought three organs at one time, and was allowed twenty-five per cent. discount for so doing on each of the organs. The $7,000 credit included this $5,000 discount, and the allowance for the old organ. The witness had asked Mr. Berman to whom the old organ belonged, and Mr. Berman had furnished a bill of sale executed by himself as the owner of the organ."

So far as appears from the testimony, appellant thought the old organ belonged to the tenant. It is not contended appellant had any actual notice of the agreement between the landlord and tenant, but appellee contends that appellant had constructive notice by reason of the recording of the lease. We cannot accept this view.

The "after acquired property" clause in the original lease only covered alterations made to the premises and all *fixtures* (with certain exceptions not important here). As we have held that the organ was not a fixture it was not included in the provision. In an extension of the old lease, which by its terms was to expire September 30th, 1926 (the extension being to September 30th, 1932), there is an additional provision "that when the lease or this renewal shall expire everything in said demised premises shall become the property of

and belong to the then landlords." This agreement of extension was dated June 6th, 1922, and, being for more than seven years, although not strictly a lease, probably came within the provisions of the recording laws. But it can hardly be contended that the recording of the paper would give constructive notice of said additional provision so far as unnamed chattels might be included in the blanket provision. The agreement dated November 13th, 1925, which was also recorded, and which contained a provision as to the organ, is neither a lease nor an extension of lease, nor any kind of a conveyance of real estate or an interest therein; and was not required to be recorded, nor does it come within the provisions of the recording laws. Besides, it was for less than seven years. The recording of it, therefore, gave no constructive notice. The sublease dated November 13th, 1925, and executed and recorded May 25th, 1926, contained a provision as to the organ, but it was for less than seven years, and therefore was not required to be recorded, and the recording of it gave no constructive notice. It would, therefore, appear that there was no constructive notice to appellant. *Lambert v. Morgan,* 110 Md. 25.

We do not mean to decide that, if the organ had been included in the original lease or the agreement of extension referred to, there would have been constructive notice. Mr. Tiffany, in his authoritative work on *Landlord and Tenant,* at page 1974, says: "Occasionally the record of such instrument as a lease is apparently regarded as sufficient for this purpose (that is charging third persons with a landlord's lien), but it does not seem that a purchaser or mortgagee of chattels should ordinarily be affected with notice of an incumbrance thereon by reason of its record among the land records." And in *Re Frederica Water Light and Power Co., supra,* it is said: "I do not consider that the vendor of the water tower was bound to inquire as to the existence of a mortgage or other lien on the land."

Nor do we mean to decide that, even if it had been shown that the conditional vendor had *actual* notice of the agreement between the landlord and tenant at the date of the con-

ditional sale, his claim would have been postponed to that of the landlord. In *Brady v. Johnson,* 75 Md. 445, 455, it is said: "It is now well settled that a mortgagee with the 'after acquired property' clause in it embraces and creates a charge upon all property subsequently acquired by the corporation mortgagor which comes within the description in the mortgage * * *. The mortgage lien, however, upon the subsequently acquired property only attaches from the time of the acquisition by the mortgagor, and subject to all pre-existing liens thereon."

No title ever passed to the tenant and he, therefore, could not pass a title to the lessor. Under a statute of this state, which has been recognized as valid, the organ was never the property of the tenant. If the organ had been lent to the tenant and, as here, had in no way been attached to the building, it would hardly be contended that it could have passed to the landlord under the agreement between the landlord and tenants. We know of no circumstances in which such a result would follow except under the distraint law. Indeed, the agreement of November 13th, 1925, seems to have contemplated that just what happened in this case might occur, and attempted to protect the landlord against the tenant in that event, for there is a covenant therein that, if the lessees shall make the improvements authorized, and shall install a new organ in place of the old, they "shall indemnify and save harmless the landlords from any and all liability, loss or expense by reason of mechanics' liens, vendor's liens or other liens."

Returning to the discussion of the question of the bearing of the taking of the old organ upon the vendor's claim to the new one. The tenant had authority from the landlords to sell the organ and to give title thereto. The conditional vendor was ignorant of the agreement that in the event of such sale the new organ became the property of the landlords. The vendor in such circumstances had no responsibility to see that the tenant fulfilled his obligations. That was a matter between the parties to the agreement.

It is argued by appellees that the taking of the old organ

by the appellant in part payment constituted the appellees purchasers for value of the new organ. If that were so, then, if the value of the old organ had not exceeded one hundred dollars it would still be true. That contention cannot prevail in a court of equity. As has already been observed, appellant did not know it was taking property of the appellee, and any injury done them can be equitably adjusted without the gross injustice of requiring appellant to exchange with appellees a $20,000 organ for one which was sold for $2,100 at the time it was taken.

As was said in *Wolf Co. v. Hermann Savings Bank,* 168 Mo. App. 549: "The tendency of the modern decisions is to give full effect to conditional sales as against the interests of prior mortgagees, where, by so doing, the security of the mortgage is not diminished (13 *Am. & Eng. Enc. of Law* (2nd Ed.) 630; *Campbell v. Roddy,* 44 N. J. Eq. 244; *Binkley v. Forkner,* 117 Ind. 185; *Hurxthal v. Hurxthal,* 45 W. Va. 584), and to adjust the rights of the parties on equitable principles, even in instances where the severance and removal of the machinery might impair the security of a prior mortgage to some extent." See also 26 *C. J.* p. 687, sec. 54; *Page v. Edwards,* 64 Vt. 124; *Bromich v. Burkholder,* 98 Kan. 261; *Hill v. Sewald,* 53 Pa. 271; *Davis v. Bliss,* 187 N. Y. 77.

Some of the cases cited by appellees are in conflict with the authorities cited herein. In others the conflict is more apparent than real by reason of differing conditions. We have found no case where the property in controversy was, as here, a chattel pure and simple, and not in some way attached to realty, or inherently incorporated with it so as to have become a part of a plant, where, under conditions in other respects similar to the present case, it has been held that the conditional vendor's claim must be postponed to that of a prior mortgagee or lessor.

It is urged by appellees that in most of the cases relied on by appellant, in which the equitable rule has been applied in favor of a conditional vendor, the question has arisen between the conditional vendor and a mortgagee or other lienor of the realty. There are in fact quite a number of cases

where the owner of the realty is involved in the character of lessor. We think for the purposes of the present case the cases are equally in point whether the interest held is that of a lessor or of a mortgagee.

As we have said, there should be an adjustment of equities in this case. The lessor should be given the benefit of such interest as he acquired under his agreement with the tenant, that is, so far as this can be done without injury to the appellant. It would seem that under the authority of *Brady v. Johnson, supra,* the appellees, having a junior claim on the organ subject to the prior claim of the vendor, in a court of equity should be subrogated to the rights of the tenant, and be permitted to make good the tenant's default, if they desire to do so, by paying into court the balance due by the tenant with interest. See also *Meyer Motor Car Co. v. First National Bank,* 154 Md. at p. 82; 1 *Williston on Sales* (2nd Ed.) page 697, paragraph 304. In default of such payments within a reasonable time, to be fixed by the chancellor, the injunction should be dissolved and the bill dismissed. As there does not appear to have been any offer by appellees to make such adjustment, they should be required to pay the costs.

> *Decree reversed, and case remanded in order that a decree may be passed in accordance with the views above expressed, with costs to appellant.*

OFFUTT, J., concurs in the conclusion.