JAMES G. MORRIS, ET UX. *v.* ANDREW W. WILSON, ET AL.

[No. 15, October Term, 1946.]

*Decided October 31, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*G. Elbert Marshall* for the appellants.

*Richard Carvell,* with whom were *William J. Bratton* and *E. D. E. Rollins* on the brief, for the appellees.

MARKELL, J., delivered the opinion of the Court.

In October, 1943, Andrew W. Wilson, his brother Alexander Wilson and his sister Mrs. Cochran (defendants, appellees) owned the Reybold Wharf Farm, on the Elk River, in Cecil County. They acquired the farm under the will of their father, who died in 1907, subject to a life interest of their mother, who died in November, 1934. By a writing, dated November 20, 1934, Andrew was, by his brother and sister, "authorized to manage the Reybold Wharf Farm and to collect all receipts from same and to make all necessary expenditures." Andrew lives at Georgetown, Kent County, and Alexander has lived in Cecil County for 53 years. Mrs. Cochran, who in 1943 was 75 years old, lives in Florida. Her son Fletcher Cochran lives in New Jersey and is engaged in business in New York City. In 1935, as "executor" of her mother's "estate," she gave Fletcher a power of attorney. In 1939 she gave him a general power of attorney as to "her real and personal property wherever situated." Mrs. Cochran, under her mother's will, had a life interest, with remainder to her children, in the "Pearce Farm," which adjoins the Reybold Wharf Farm but has no water front. The Pearce Farm therefore is more salable with the Reybold Wharf Farm than separately.

Thus in 1943 Fletcher had authority to sell Mrs. Cochran's interest in either or both farms, but no authority to sell Andrew's or Alexander's interest in the Reybold Wharf Farm; Andrew had no authority to sell his sister's interest in the latter farm. When asked whether Andrew had the right to sell Reybold Wharf Farm or Mrs. Cochran's interest in it, Fletcher testified, "No, I don't think so. * * * our method of procedure in the sale of anything connected like this Reybold Wharf Farm would be to submit whatever offers or propositions had been made for approval and, in that event, if we all agreed, why then we would have a sale." This prudent practice was pursued without much consideration for third persons.

For some time the owners of both farms had wanted to sell them. On July 26 and August 25, 1943, Fletcher wrote to Clark Grieb, of Chestertown, undertook to give him an exclusive agency for "60 to 90 days" to sell both farms, and said, "Tentatively a figure of $8,500 for Reybold Wharf and $22,500 for the Pearce Farm will do for a starter." Some time in July or August Andrew had another purchaser for the farm, and went to the office of Mr. Harrison W. Vickers, in Chestertown, to consult him. They telephoned Fletcher, who said, "Don't do anything. * * * I have placed this farm in Mr. Greib's hands." Greib was present. On September 21, 1943, Grieb negotiated a sale of both farms to Wilbur Hubbard for $30,000 and obtained a deposit of $5,000 from Mr. Hubbard. A contract of sale, in the names of the respective owners, of both farms, was prepared and sent to Fletcher for circulation and execution by the several parties. Fletcher says, "as soon as [he] had received this sale contract," he called Andrew up and told him that Grieb had sold both farms to Mr. Hubbard. Andrew says, we think correctly, that he did not know anything about the Hubbard sale until after October 2, 1943.

At intervals during the five years before 1943 Andrew and Alexander had spoken about the farm to Orange B. Burrell, a real estate broker at Earleville, stating a price and asking him to sell it. Andrew says he employed Burrell to sell the farm to net the sellers $9,000. Burrell sold it to plaintiffs (appellants) for $9,500 and was to be paid $500. Andrew consulted with Alexander about the sale; "he agreed to it, first get your money." Burrell says when he made the sale to Mr. Morris, he "was selling the whole farm," not just the interest of Alexander and Andrew. Andrew says that before the sale to plaintiffs he told Fletcher the farm was in Burrell's hands and Fletcher didn't make any objection to it and knew Burrell was trying to make a sale.

Plaintiffs live in Philadelphia above the husband's store. Their daughter, now 25, has been employed in her father's store since she was 18. Among her duties,

when her father is away, is to open the mail "and take out the checks and see that they get to the bank." Unless the mail concerns the business, she puts it aside (without reading it) for him to read when he gets back.

On October 1, 1943, plaintiff husband came to Cecil County looking for a river front farm. He met Burrell, was shown several farms, and made out and turned over to Burrell a deposit check for the Reybold Wharf Farm, viz., a check dated October 1, 1943, to the order of Andrew Wilson, Agent, for $500, "Deposit on Wilson Farm at Reybold Wharf for the purchase price of $9500." After Mr. Morris had left, Burrell saw Andrew and offered him the $500 deposit check but Andrew said he would not take it "until we have an agreement." The next morning, Saturday, October 2nd, Burrell and Andrew went to Elkton, saw a lawyer, Mr. James Weinroth, and "Mr. Burrell dictated the agreement to Mr. Weinroth." Andrew signed it as agent, and Burrell mailed it in duplicate to plaintiffs, who signed one copy and returned it by mail. Andrew deposited the check in an account in his name as agent.

The agreement, dated October 2, 1943, between Andrew W. Wilson, Agent, Seller, and plaintiffs, Buyers, provides that: Seller sells to Buyers "All that certain farm," known as "Reybold Wharf Farm," for $9,500 payable, $500 received, the balance of $9,000 within 30 days; Buyers "shall receive immediate possession" for repairs and improvements, but no buildings and improvements shall be torn down "before full settlement"; Seller will within 30 days execute a deed to the farm, "free and clear of any liens and encumbrances," and "in the event that the said Seller is in anyway unable to give such deed then any sum or sums paid shall be refunded by the said seller"; and if Buyers shall fail to make settlement within 30 days, then "the said $500 paid hereon shall be deemed liquidated damages for their failure so to do and shall not be returned to them."

The same day, October 2nd, Andrew wrote to Fletcher that Burrell had sold the farm to Morris for $9,500.

"We are to pay Mr. Burrell $500 as his commission, which leaves us $9000 clear. Jimmie Weinroth drew up a lease this morning for thirty days for $500, which I am depositing in the bank. Hope that this will be satisfactory. Please tell me where I can locate your mother in reference to signing the deed, which Jimmie is drawing this week." On receipt of this letter Fletcher on Monday, October 4, telephoned Andrew and says he told Andrew he, as attorney, and his mother would not execute the contract. Andrew says Fletcher said, "What right did you have to sell my mother's part of that farm" and that Grieb had sold the farm to a man in Chestertown; Andrew said, "Well, how did Mr. Grieb sell the farm when he hasn't my O. K. on it?" Nevertheless Andrew had the deed drawn, executed by him and Alexander and sent to his sister, who returned it unexecuted.

Mr. Weinroth on October 6 wrote Mr. Morris that Andrew had "contacted" him again with reference to the farm and it appeared there was "some slight disagreement between the owners of the property, which I feel will be straightened out very soon." However, he advised Morris "not to make any improvements or undertake any expense" about the farm until after the settlement date, in order "to protect yourself from any possible loss." On October 20 Burrell wrote to Morris that he was sorry for the delay in getting the deed, that it had been on the way for several days, "has to go to Florida to one heir and then to New York for another and two are here at Cecilton. The one at New York owns the farm adjoining * * * and thought she had a buyer for hers and yours together, and wanted Wilson to sell it with hers, but he refused as he already had sold it to you. That is the only mix-up, and that is alright now. Andrew Wilson has handled the estate for many years and he says she will sign the deed with the rest of us when she receives it." On October 24 Morris acknowledged Burrell's letter and said, "unless I am otherwise notified I'll be down to make settlement on Friday, the 29th."

When the sister refused to execute the deed and returned it unexecuted, Andrew on the afternoon of Monday, October 25, gave Burrell a check of Wilson, Agent, dated October 25, to Morris' order, for $500, and the contract signed by plaintiffs, which Burrell mailed to Morris with a letter, misdated October 24, saying, "I am returning check for the farm, one of the heirs would not sign the deed, but returned it from Florida unsigned. I am very sorry it did not go through as planned."

The letter and check did not reach Morris' office until October 27, after Morris that morning had left Philadelphia to visit his father, who was ill. Morris did not return until late on the afternoon of the 29th. Meanwhile on the 28th his daughter had deposited the check, endorsed for deposit by his wife in his name.

When Morris on his return learned that the check had been deposited by his daughter (in accordance with her orders), he says he "blew his cork," i. e., became "very angry," and immediately telephoned Burrell and asked why the transaction was called off, and was told "the sister won't sign off" because of her riverside farm. He asked Burrell to make arrangements for him to talk with Wilson and was informed that Wilson wouldn't see him. He then telephoned an officer of his bank, after banking hours, to have payment of the check stopped and the check returned. He was told it was too late. Both Morris and Burrell deny that Morris said he would not enter suit. Morris says Burrell said, "I suppose you feel you ought to be compensated," to which he replied, "I am not interested in that." Burrell says Morris said "he might go to law about it, but when he didn't know, and probably nobody would get much out of it except the lawyers; * * * he expected it wouldn't be any use to enter suit." The next morning, Saturday, October 30, he sent a real estate man, named Reed, now deceased, with a certified check for $9,000 and another check for $500, to the order of Wilson, Agent, to see counsel in Maryland and to see if he couldn't close the deal or

see what he could do with it. There is no evidence of what Reed did, or of any tender of, or attempt by Morris to repay, the $500 deposit—or return the contract signed by plaintiffs.

On October 28 Fletcher had a meeting in Georgetown with Andrew and Alexander. He says: "We had reached a stalemate. I was unable to complete Grieb's contract with Hubbard, * * * and Andrew couldn't complete his contract with Morris." Accordingly Fletcher agreed to buy, on his mother's behalf, on a basis of $9,500, a two-thirds interest in order to complete his contract with Hubbard. He gave his lawyers a check for $6,333.33, dated October 29, to purchase the two brothers' interest. Their interest was conveyed to their sister by deed dated November 10, recorded November 12.

On November 2, 1943, plaintiffs filed against defendants a bill, and on February 21, 1944, an amended bill, for specific performance of the contract of October 2, 1943. On January 3, 1945, plaintiffs filed a supplemental bill, in which for the first time they prayed that, if they are not entitled to the relief prayed against all the defendants, then specific performance may be decreed against such one or more as may be bound by the contract, with a proportionate fractional abatement of the contract price for the share or interest not decreed to be conveyed. From a decree, dated March 20, 1946, dismissing the amended and supplemental bills, "without prejudice to the plaintiffs to avail themselves of any remedy they may have at law," plaintiffs appeal.

As we have already said, there is no evidence that Andrew had authority to sell his sister's share. As the lower court has said, even if he had had authority to sell or to find a purchaser he would not therefore have had power to sign a contract of sale. *Karupkat v. Zoph,* 140 Md. 242, 245, 117 A. 761; *Brown v. Hogan,* 138 Md. 257, 266-269, 113 A. 756. He says he took the authority to sign as agent "on his own say so." He evidently believed that the sale was advantageous and would be ratified by his sister—as it doubtless would have been

if she had not been more interested in getting a good price for the Pearce Farm than for the Reybold Wharf Farm.

The principle as to partial specific performance, with abatement, invoked by plaintiff, has been recognized by Lord Nottingham 250 years ago (*Cleaton v. Gower*, Finch 164) and in many subsequent English and American cases. In the application of the principle, lines have not been sharply drawn, and it would not be easy to reconcile all the English or the American cases. Such cases are governed largely by the rule that specific performance is not a matter or right, but of sound judicial discretion.

In the case at bar there are no strong equities on either side. Mrs. Cochran used the Reybold Wharf Farm to sell the Pearce Farm. The brothers used the sale to plaintiffs to get from their sister a higher price than Fletcher had named to Grieb. If plaintiffs could get, by specific performance, a part interest in a partition suit, they might perhaps get a still higher price from Mrs. Cochran to enable her to carry out the Hubbard contract. Specific performance is granted on the strength of a plaintiff's equities, not on the weakness or absence of a defendant's equities.

Lord St. Leonards says: "* * * a purchaser may, in some cases, insist upon having the part or interest in an estate to which a title is produced, although the vendor could not compel him to purchase it; it is true generally, *but not universally*, that a purchaser may take what he can get, with compensation for what he cannot have; * * *." (Italics in original.) *Sudgen on Vendors*, 8th American Ed., *305. "But to be entitled to specific performance with compensation, the buyer must, generally, have been unaware of the deficiency at the time of the bargain." *Pomeroy, Equity Jurisprudence*, 4th Ed., *Equitable Remedies*, 2d Ed., Sec. 2256, p. 5041.

In a suit for specific performance of a contract of sale made by trustees under a marriage settlement through an agent, the contract was made by the agent

with the approval or at the instance of the husband life tenant, who pending suit became owner in fee upon the death of the wife without issue. Lord Eldon, having refused specific performance against the trustees, also held that the contract could not be enforced against the husband, as he had been acting only for the trustees and not for himself. *Mortlock v. Buller,* 10 Ves. 292, 315-317.

In America it is generally (though not universally) held that a contract with a tenant in common cannot be specifically enforced against one or more when the contract is in the name of all, but only some sign (*Axe v. Potts,* 349 Pa. 345, 37 A. 2d 572, 154 A. L. R. 764), or when the contract is in the name of one, whom the purchaser knows to be only a tenant in common. *Larson v. Kearney,* 110 N. J. Eq. 561, 160 A. 514.

It may be that in signing as agent, Andrew warranted his agency for all and is liable at law for breach of warranty. We agree, however, with the lower court that his signature as agent was not a representation that he was sole owner, but was notice to the contrary. We also agree that plaintiffs are not entitled to partial specific performance with abatement.

We also think that, if plaintiffs had otherwise been entitled to partial specific performance, they failed to assert their right with due diligence. We assume, without deciding, that the contract provision for return of the deposit was not plaintiffs' exclusive remedy and that plaintiffs did not accept rescission by depositing the check and retaining the proceeds. Acceptance involves not only receipt, but also knowledge and intent (*Enterprise Mfg. Co. v. Oppenheim, Oberndorff & Co.,* 114 Md. 368, 79 A. 1007, 38 L. R. A., N. S., 548), though acts may be so unequivocal as not to permit denial of intent. *Murphy & Hutt v. American Can Co.,* 106 Md. 190, 67 A. 17; *Russo v. Hochschild, Kohn & Co.,* 184 Md. 462, 41 A. 2d 600, 157 A. L. R. 1070. We should not be prepared to hold that one who orders deposit of all checks, without inquiry, can avoid the legal consequences of acceptance by merely becoming angry at himself without even at-

tempting to return the money. We also assume, without deciding, that no supplemental bill is necessary, but that partial specific performance can be granted under the prayer for general relief, whenever it is found impossible to grant complete specific performance. Plaintiffs knew, however, when the original bill was filed, that Andrew's authority to bind his sister was denied and was supported by little or no evidence. Andrew and Alexander could not have compelled specific performance as to their two-thirds. So far as appears, plaintiffs gave no indication of willingness or desire to accept two-thirds or one-third until they filed their supplemental bill 14 months after their original bill.

A bill for specific performance must be filed promptly. *Powichrowski v. Sicinski,* 139 Md. 376, 114 A. 899. Plaintiffs were unusually prompt in filing their original bill. Whether or not the filing of the bill was actually known to defendants (which they deny), the conveyance *pendente lite* from the brothers to the sister created no new equities. But we think plaintiffs were too late in making known their desire to acquire, in lieu of a farm, an interest in a partition suit. In *Farber v. Blubaker Coal Co.,* 216 Pa. 209, 65 A. 551, it was held that a vendee had rescinded his contract by refusing to accept conveyance (with abatement) of five-sixths of the property, and could not afterwards maintain specific performance for six-sevenths, after vendor had acquired a larger fractional interest. In the circumstances of the case at bar we think plaintiffs, by their conduct, had elected to take all the farm or none.

The decree below reserves to plaintiffs any remedies they may have at law.

*Decree affirmed, with costs.*