# PHILLIPS H. CLARKE, ET AL. *v.* HENRY M. BRUNK, ET AL.

## ET AL.

[No. 39, October Term, 1947.]

*Decided December 10, 1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Ignatius J. Keane* and *Robert L. Edwards* for the appellants.

*Bird H. Dolby*, with whom was *Roscoe H. Parker* on the brief, for appellees, Henry M. Brunk and others.

*Arthur C. Keefer*, with whom was *T. Howard Duckett* on the brief, for the appellee, F. X. Wilson and others.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree sustaining, on the ground of laches, demurrers to a bill for specific performance of an agreement which gave plaintiffs an option to purchase real property, and dismissing the bill, with costs, "without prejudice to sue" at law. The option agreement, under seal, not acknowledged, was dated December 1, 1941 and was recorded September 22, 1942. The bill was filed February 20, 1947.

By the option agreement between defendants Brunk and wife and plaintiffs the Brunks gave plaintiffs "the option of purchasing" certain property on terms and conditions stated: 1. All the lots owned by a good and marketable title (it being understood that the Brunks have not marketable title to all lots) by the Brunks in Section No. 2 of West Lanham Hills, at "the price of $250 cash per lot, plus $150 for street surfacing, curb, gutter and sidewalk, or $112 if no sidewalk is in place, also the further sum of $65 representing the escrow money for street maintenance heretofore deposited by the [Brunks] under requirements of the Federal Housing Administration," which $65 is to be refunded to plaintiffs if and when the Brunks obtain a refund of their escrow money already deposited, "and also pay [sic] the further sum of $50 for each lot purchased to be applied on" a note of plaintiff Clarke to Brunk for $5,-265.71 [until the note is paid], "making a total of $515 cash or $477 cash if no sidewalk in place to be paid to the [Brunks] for each lot purchased in said Section 2 of West Lanham Hills." 2. All the lots owned by a good and marketable title by the Brunks "in the 'West Lanham' subdivision" at the price of $300 cash per lot, plus the additional payment of $50 on the note. 3. "After all of the marketable title lots in Section No. 2 of West Lanham Hills, and West Lanham subdivision are purchased, the [Brunks] are to have new sections of West Lanham Hills subdivided, plats recorded, streets rough graded in accordance with requirements of Washington Suburban Sanitary Commission, and lots surveyed and corner stakes

placed * * * in time to fill the monthly quota of lots to be purchased, as hereinafter mentioned, otherwise, said quota to be suspended until said work is done. Provided however, if the [plaintiffs] are unable to obtain F.H.A. insured loans in 'West Lanham' subdivision, then new section of West Lanham Hills to be made available as soon as the marketable title lots in Section 2 of West Lanham Hills is [sic] exhausted, and in such case [plaintiffs] agree to pay all Sanitary Commission front foot charges in West Lanham from date of purchase of first lot in new section. Said new sections to be opened from time to time as needed until all of the property of the [Brunks] in the West Lanham Hills area is purchased, but all marketable title lots in one section to be purchased before any lots are purchased in the newest section; it being understood that all of the land of the [Brunks] lying south of sections 1 and 2 of West Lanham Hills is to be reserved until all the rest of the marketable title land is purchased. All land in new sections to be sold at the price of $250 cash" plus $50 to be paid on the note. "In case of either sewer or water now or hereafter being laid in front of any tax title lots, and the [Brunks] giving notice to buy, the [plaintiffs] shall buy such lot within ninety days after such notice at and for the price of $150 or else the option as to such particular tax title lots shall terminate, and the [Brunks] shall have the right to build thereon, or to sell such lot to another person who is acceptable to the [plaintiff]." * *· * 8. "The option is further given to the [plaintiffs] to purchase all of the right, title and interest of the [Brunks] in all land remaining unsubdivided at the time of exercising this option, in the West Lanham Hills area including tax titles in subdivided area for $30,000 plus actual expenses in connection with preparation of new sections hereafter incurred, payable one-third cash and one-third each year with interest at * * * six *per centum* * * *, to be secured by first mortgage with a release clause of $150 per building lot, or all cash at option of purchasers." 9. "Time is of the

essence of this option and it is distinctly understood and agreed that the [plaintiffs] will purchase at least eight lots in each and every month beginning in January, 1942, and continuing until every marketable title lot shall have been purchased, provided however that if more than eight lots are purchased in any month, the excess may be applied toward any subsequent month's quota that the [plaintiffs] may elect, and * * * lots purchased before January 1, 1942 shall be considered as part of the January, 1942 purchases. Upon failure of the [plaintiffs] to take the required number of lots at any time (provided the [Brunks] have made the lots available as above provided for), all options contained in this instrument will be terminated and of no further effect."

The bill alleges in substance that: Between January and April, 1942 more than eight lots per month were bought, as required by paragraph 9 of the agreement, pursuant to paragraph 1, for which the full purchase price of $515 was paid, of which $150 was to pay for street surfacing, curb, gutter and sidewalk. Although paid to do this work the Brunks failed to do it, and disabled themselves from doing it by removing to Florida until April, 1942. Meanwhile plaintiffs were carrying on construction operations on lots purchased and were seriously handicapped by these breaches by the difficulty of ingress and egress. The street work was not completed until the fall of 1942, was done with inferior materials and did not "meet with" the minimum requirement of the Federal Housing Authority [sic]. A total of 52 lots were purchased pursuant to paragraph 1. In March, 1942 plaintiffs had obtained "priorities," which by their terms required that they be used immediately, for the construction of two hundred dwelling units. The Brunks, "although frequently requested to do so, failed to fulfill their obligations" under paragraph 3 (regarding subdivision of new sections, rough grading of streets, survey, etc.) and "made it impossible for plaintiffs to continue the building operations contemplated by the agreement." After these "breaches" plaintiffs "attempt-

ed to avail themselves of the option privilege of paragraph 8, the intent of which was that plaintiffs could purchase the land * * * as a whole tract and prepare said land themselves for the construction of houses." On or about May 15, 1942 plaintiff Clarke stated to defendant Henry M. Brunk "that he was ready and willing and able to exercise his option privilege under paragraph 8, and the said defendant refused. Repeated offers were made from that time until on or about" September 15, 1942. In spite of these "repeated demands" of plaintiffs, the Brunks "have refused to comply with the terms of said agreement," plaintiffs "have complied with all the terms of said agreement on their part," but the Brunks "refuse to make conveyance" of the property to plaintiffs, "as they rightfully and in good conscience ought to do." On September 5, 1942 plaintiff Clarke for $100 obtained an option to purchase adjoining land which was of no value to him without the Brunks' land; after the refusal of the Brunks to comply with the terms of their agreement, plaintiff was forced to forego this option "to his irreparable damage."

By six deed dated from March 12, 1943 to September 11, 1946 the Brunks conveyed a total of ten lots in West Lanham, one of which was again conveyed by the first grantee in April, 1946. By deed dated March 20, 1946 the Brunks conveyed ten lots in Section 2, West Lanham Hills, which by the grantees were in May, 1946 conveyed to trustees to secure a debt of $52,500 to a bank and were by ten deeds dated from September 12, 1946 to November 19, 1946 conveyed to other grantees, who executed mortgages on them to the bank for amounts aggregating $75,000; the $52,500 deed of trust has been released as to all but one of the ten lots. On October 8, 1946 the Brunks recorded a plat of a subdivision known as Section 5, West Lanham Hills. By deed dated October 14, 1946 they conveyed ten lots in that subdivision, which by the grantees were conveyed to trustees to secure a debt of $56,000 to the bank. Section 1 of West Lanham Hills is not a "new" section of West Lanham

Hills under paragraph 3 of the option agreement; whether it is part of the "West Lanham Hills area" under paragraph 8 is not expressly stated in the agreement or in the bill. In the bill the Brunks, six of their grantees (and their respective wives), ten subsequent grantees (and their wives), the trustees and the bank are named as defendants. It is not alleged that any of the defendants other than the Brunks had actual knowledge or notice of the option agreement.

The bill prays (1) specific performance of the option agreement by the Brunks "as to all land included in the agreement * * * and not conveyed by them" upon payment to them by plaintiffs of the purchase price as stated in the agreement; (2, 3) specific performance as to the lots conveyed to some (not all, for reasons unexplained) of the other defendants, "free and clear of any incumbrances" placed thereon by them, "upon payment by plaintiffs of the purchase price as stated in the * * * agreement"; (4) that "in the event specific performance is not practicable as to any part or parts of the subject matter of the contract," the court retain jurisdiction "to assess monetary damages for such breaches"; (5) that the court retain jurisdiction "to assess monetary damages for the breaches of contract" committed by the Brunks; and (6) general relief. Plaintiffs asserted, in their brief and at the argument, that the lots "conveyed away" by the Brunks constitute "an insignificant portion of the land in controversy."

We may assume, without deciding, that under paragraph 1 of the option agreement the Brunks had not only a right to receive $150 per lot "for street surfacing, curb, gutter and sidewalk" if they did that work, but an obligation to do the work (except sidewalk), and for breach of this obligation plaintiff may "sue at law" within the period of limitations and are not restricted to recovery of the $150 paid; that plaintiffs may likewise sue for the Brunks' failure "to fulfill their obligations under paragraph 3" (regarding subdivision of new sections, rough grading of streets, etc., "in time to fill

the monthly quota of lots to be purchased," "after all of the marketable title lots in Section No. 2 of West Lanham Hills, and West Lanham subdivision are purchased") ; that breach of the Brunks' obligations under either paragraph 1 or paragraph 3 would "suspend" the quota under paragraph 9; and that exercise of the "option privilege" under paragraph 8 is sufficiently alleged by "repeated offers" and refusal without formal tender or more definite allegations. We may even, for present purposes, ignore the fact that the 52 lots purchased (in Section 2, West Lanham Hills) "filled the quota" through June, 1942 and the conveyances from March, 1943 to September, 1946 of twenty lots in "West Lanham" or "Section 2, West Lanham Hills" also indicate that in March 1942 "all of the marketable title lots" in those two subdivisions had not been purchased and therefore the Brunks had not failed to fulfill their obligations under paragraph 3. On these assumptions it is sufficient to decide (as the lower court did) whether the bill states a case for specific performance of the option under paragraph 8.

Nothing in the bill implicates any of the other defendants in any alleged breach of contract by the Brunks. "* * * wherever the specific execution of a contract or covenant respecting lands would have been decreed as between the original parties, it will be decreed as between all persons claiming under them in privity of estate, or of representation, or of title, unless other controlling equities have intervened," but in order to obtain such relief "it is necessary that the allegations of the bill should fully and exactly disclose the nature and extent of the legal rights and interests of those against whom the restraining and coercive power of a court of equity is sought." *Worthington v. Lee,* 61 Md. 530, 535, 536. The option agreement was not acknowledged and therefore was not entitled to be recorded. The recording of it, therefore, gave no constructive notice. *Wurlitzer Company v. Cohen,* 156 Md. 368, 378, 144 A. 641, 62 A. L. R. 358; *Lambert v. Morgan,* 110 Md. 1, 27, 28,

72 A. 407, 132 Am. St. Rep. 412, 17 Ann. Cas. 439. No other notice is alleged. Indeed, if these defendants had actual knowledge of the record, it would not indicate any breach of the agreement by the Brunks or any exercise of the option under paragraph 8, but would rather suggest abandonment of the option agreement, by plaintiffs or by both parties, months before the first and years before the last of these defendants received conveyances. The bill does not allege that these defendants were purchasers for value, but if they were not, *e. g.*, if they were mere nominees, donees or other volunteers, that fact should have been averred. The natural inference from the long recital of conveyances, especially the deeds of trust and mortgages, is that the conveyances represented sales (and liens) for value.

At the argument it was stated that, after breaches of the agreement by the Brunks, plaintiffs acted on advice of former counsel (endorsed in argument by present counsel) that all that was necessary was to record the agreement—presumably to block sales and force some settlement with plaintiff. The recording laws and the principles of specific performance are not designed for embalming stale claims for nuisance uses. On the contrary, "A party cannot call upon a court of equity for a specific performance, unless he has shown himself, ready, desirous, prompt and eager." *Milward v. Thanet,* 5 Ves. 720, note *b,* quoted in *Penn v. McCullough,* 76 Md. 229, 231, 232, 24 A. 424, and *Doering v. Fields,* 187 Md. 484, 50 A. 2d 553, 555; see also *Morris v. Wilson,* 187 Md. 217, 49 A. 2d 458, 462, 463. This requirement is particularly stringent when "time is of the essence." *Tarses v. Miller Fruit & Produce Co.,* 155 Md. 448, 453, 454, 142 A. 522. In the case at bar plaintiffs, in their bill, have shown themselves to be anything but prompt and eager. It is trite to remark that this court takes judicial notice of the War and, without actual or judicial notice of particular conditions in the real estate market at Lanham, may suppose that they were materially different in 1942 and 1947. *Cf. Doering v. Fields, supra.*

The bill shows that of the entire undeveloped land which plaintiffs say they contracted to purchase on May 15, 1942 for $30,000 (plus actual expenses, if any, between December 1, 1941 and May 15, 1942) an "insignificant portion" has between 1943 and 1946 been developed and sold, and mortgaged (improved or unimproved) for upwards of $130,000. Delay from May 15, 1942 to February 20, 1947 in instituting suit is unexplained. Alleged breaches of paragraphs 1 and 3 of the agreement by the Brunks in failing to do street work or other preparation for building are immaterial, since (as plaintiffs allege) "the intent of [paragraph 8] was that plaintiffs could purchase the land as a whole tract and prepare the land themselves for the construction of houses."

Ordinarily the defense of laches involves not mere lapse of time (short of the period of limitations) but also some prejudice to the defendant and must be made by answer showing such facts. If, however, the bill on its face shows both lapse of time and prejudice or such lapse of time and circumstances as suggest prejudice or acquiescence and call for explanation—or in a specific performance case shows the plaintiff not to have been prompt and eager—the bill is demurrable. *Salisbury v. Camden Sewer Co.,* 135 Md. 563, 571, 109 A. 333; *Plitt v. Kaufman,* 188 Md. 606, 53 A. 2d 673, 677. In the case at bar plaintiffs in effect seek to take from the Brunks all the profits (realized and unrealized) from a five-year real estate speculation conducted by the Brunks at their own risk and expense, without effort, risk or expense on plaintiffs' part. We think the bill on its face shows laches, if not abandonment of the contract on plaintiffs' part so far as specific performance is concerned.

At the argument plaintiffs complained that their bill was dismissed "without leave to amend." Amendments are usually freely allowed, but are discretionary with the lower court and with this court. Amendments are futile where a case turns on points not curable by amendment. This case was disposed of by the lower court in a full and careful opinion, which we have closely fol-

lowed. Nothing said at the argument indicates to us that the bill could be cured by amendment—unless by virtually setting up some new and different case.

*Decree affirmed, with costs.*