BERMAN *v.* LECKNER ET AL.

[No. 150, October Term, 1948.]

178

180

*Decided May 19, 1949.*

The cause was argued before Marbury, C. J., Dela-plaine, Collins and Henderson, JJ.

*Joseph Loeffler* for appellant.

*J. Calvin Carney* for Leona Fear Thomas, appellee.

No brief and no appearance for other appellees.

DELAPLAINE, J., delivered the opinion of the Court.

Benjamin L. Berman, administrator *d. b. n.* of the estate of Boston Fear, deceased, brought this suit in the Circuit Court No. 2 of Baltimore City against Mary Fear Leckner and eight other defendants for discovery and delivery of personal property allegedly belonging to decedent's estate but wrongfully held by defendants.

Decedent, who lived for many years in a large home situated at Poplar Hill Road and Elgin Avenue, died on April 11, 1918. He was survived by nine children, six of whom—a married daughter, Mary Leckner, and three unmarried daughters, Rosalie (now Welsh), Margaret (now McKenna), and Elizabeth (now Raith), and two sons, George and Herbert—were still living at home. His other three children were Leonora Thomas, Daisy Anderson and Fred. Decedent also had three grandsons, Boston 3d, George and Leo, sons of Boston, Jr., deceased.

The bill of complaint alleged that all of the personal property in the home, including furniture, oil paintings, musical instruments, and other chattels, belonged to decedent at the time of his death, and that the four daughters who lived with him wrongfully divided the property. Three defendants demurred to the bill, and the chancellor sustained the demurrers and dismissed the bill. On April 18, 1947, the decree was reversed by the Court of Appeals. We held that a court of equity may enforce the surrender of chattels which have been obtained tortiously or which are wrongfully held, if they consist of heirlooms, paintings or other works of art which have a sentimental or unique value or have no ready market value. *Berman v. Leckner,* 188 Md. 321, 52 A. 2d 464. After the case was heard on its merits, the chancellor again dismissed the bill, and complainant is now appealing from the second dismissal.

To make a valid gift *inter vivos*, there must be a clear intention on the part of the donor to transfer title to the property, and also a delivery by the donor and an acceptance by the donee. It is essential to the validity of such a gift that the transfer of both possession and title shall be absolute and shall go into immediate effect. In other words, the donor must intend not only to deliver possession, but also to relinquish the right of dominion. If a gift has reference to a future time when it is to operate as a transfer, it is only a promise without consideration, and cannot be enforced either at law or in equity. *Whalen v. Milholland*, 89 Md. 199, 201, 43 A. 45, 44 L. R. A. 208; *Howard v. Hobbs*, 125 Md. 636, 640, 94 A. 318; *First National Bank of Cumberland v. Thomas*, 151 Md. 241, 250, 134 A. 210, 47 A. L. R. 730; *Pomerantz v. Pomerantz*, 179 Md. 436, 19 A. 2d 713. The intention of the donor, however, need not be expressed in any particular form. It may be manifested by words or acts, or both, or may be inferred from the relation of the parties and the facts and surrounding circumstances of the case.

The first persons to investigate the alleged gift to Mary, Rosalie, Margaret and Elizabeth were their sister, Leonora Thomas, and her husband. They consulted Edward L. Ward, attorney, now deceased, in February, 1919. Ward advised that Margaret informed him that her father during his lifetime had given all of the furniture in the house to Mary, Rosalie, Elizabeth and herself, and that he was certain it "would not pay the heirs to fight over it." Quoting Margaret further, the attorney wrote: "She states that it was given to the four girls in equal shares and that she can prove this by her sisters, her two brothers, and her sister-in-law. She says that one of the reasons which caused him to do this was that he gave to Mrs. Anderson and Mrs. Thomas, each, a house completely furnished, and he felt that it was only proper that the other girls should have the household property at home."

Despite the attorney's advice, George Fear qualified as administrator of his father's estate on July 25, 1919; and on August 18, 1919, he filed a petition in the Orphans' Court charging that two of his sisters, Mary and Margaret, were concealing assets of the estate. The sisters filed answers denying absolutely that they had concealed any assets, and asserting that they had acquired title to their father's personal property long before he died. The administrator never filed an inventory or took any further action in the matter. Another investigation was made by Mrs. Thomas and others when they consulted Vernon Cook, attorney, concerning the advisability of contesting the title of Mary, Rosalie, Margaret and Elizabeth. After this conference they decided not to take any action.

After the passage of a quarter of a century, the next member of the family to make complaint was Margaret McKenna, one of the four who had divided the property. On April 16, 1944, she complained to the administrator about the way the furniture and other effects had been divided. She rankled over the fact that George, Fred and Herbert were the first to divide the property, taking "the cream," while she did not get anything until several weeks later. One of the causes of her dissatisfaction was the fact that she wanted the picture of Queen Anne, but was urged to take Lord Colt. The outgrowth of her letter was that on May 12, 1944, Daisy Anderson, Boston Fear 3d, Herbert C. Fear, son of Herbert R. Fear, deceased, George Fear, individually and as administrator, and Fred Fear filed a petition in the Orphans' Court alleging that Mary Fear Leckner and others possessed various pieces of personal property belonging to the estate of Boston Fear. That proceeding likewise was dropped. George Fear died in November, 1944. In April, 1945, complainant was appointed administrator *d. b. n.* of the estate and on May 10, 1946, he filed the instant suit.

At the trial of the case Rosalie Welsh recalled that her father, becoming heavily involved financially, executed a

deed of trust for the benefit of creditors, and also pawned his diamonds to pay his taxes and other debts. She testified positively that her father gave all of the property in the home to her and to Mary, Margaret and Elizabeth. She further testified that she and her three sisters decided to keep all of the furniture and other things in the parental home until they obtained their own homes. In February, 1919, while she was living temporarily on the Eastern Shore, she was requested to come to Baltimore to pick out the things she wanted. She said that when she came to the house, both George and Herbert were there. She also called to see her brother Fred, who agreed to keep the pieces she had chosen until her return to Baltimore.

John Leckner, Mary's husband, testified that Mary selected the piano and several other musical instruments and a number of pictures, including a portrait of Queen Anne. He substantiated the story that decedent had pawned his diamonds to pay pressing debts. He testified that the diamonds were afterwards sold for $2,100, of which amount $1,380 was paid to the pawnbroker.

Leonora Thomas testified that all she received from the division of the property was a part of a grandfather's clock. This, she said, was sent to her without any solicitation. In later years she paid a total of about $1,500 for the purchase of various things that had once been owned by her father. From Fred she bought two oil paintings for about $85, and two chairs and a statuette. She also bought a table and two vases from a pawn shop for about $35. About 1936 she bought from Rosalie a lot of books for about $100, and a candlelabra for about $25. She swore that she gave Rosalie $1,000 for a stauette, worth only about $200, to help save her home, which was being foreclosed under a mortgage. She also paid Rosalie $200 for an oriental rug.

Complainant earnestly contends (1) that the four daughters failed to prove that their father had given the property to them, and (2) that defendants participated

in a wrongful division of the property and conspired to conceal the facts. Defendants, however, produced evidence to show that the father had given the property to the four daughters, who were living with him at the time of his death, inasmuch as he had given a house to each of the other two daughters, Leonora Thomas, and Daisy Anderson. Nothing was done clandestinely. The four daughters openly divided all of the furniture, paintings, musical instruments and other chattels with every semblance of right of dominion over the property.

Ordinarily the defense of laches must be made by answer alleging facts showing lapse of time and also prejudice to the defendant, yet if the bill of complaint shows on its face both lapse of time and prejudice, the bill is demurrable. *Clarke v. Brunk,* 189 Md. 353, 55 A. 2d 919. When the instant case was heard on the previous appeal, we were unwilling to hold the bill demurrable on the ground of laches. *Berman v. Leckner,* 188 Md. 321, 329, 52 A. 2d 464, 467. It was urged by complaintant (1) that a fraud had been perpetrated in 1919, and (2) that the fraud was not discovered until 1944. It is entirely true that it is an essential element of laches that the party charged with it should have had knowledge or the means of knowledge of the facts creating his right or cause of action. Laches cannot be imputed to a party who has been justifiably ignorant of the facts creating his right or cause of action, and has consequently failed to assert it. Thus, in suits alleging fraud, time begins to run, not from the perpetration of the fraud, but from its discovery. Mere lapse of time will not bar a defrauded party's right to relief while he remains ignorant of the fraud and has no knowledge of facts which would lead a man of ordinary prudence to its discovery. *Sears v. Barker,* 155 Md. 323, 330, 141 A. 908; *Labanowski v. Mayor and City Council of Baltimore,* 168 Md. 127, 132, 176 A. 615.

But in the case at bar the chancellor upheld the claim of the four daughters and the division of property they made thirty years ago. After a thorough investigation of the evidence, the chancellor came to the conclusion that the contention of complainant was not supported by the weight of the evidence. The testimony was taken in open court, where the chancellor had the opportunity to see and hear the witnesses and to observe their expression and demeanor. In weighing the testimony and passing on its credibility, he received from these observations an advantage which the Court of Appeals does not have. It is an invariable rule that the Court of Appeals will not reverse a decree of a court of equity upon a finding of facts, unless it is apparent that the court's determination is not supported by the clear weight of the proof. *Lickle v. Lickle,* 188 Md. 403, 52 A. 2d 910; *Smith v. Smith,* 192 Md. 111, 63 A. 2d 628.

Complainant argued that the letter which Margaret McKenna wrote to the administrator in 1944, complaining that Herbert and Fred had gotten some of the household effects at the time of the division, tended to show that fraud had been perpetrated. The term "fraud" in equity includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and which are injurious to another or by which an undue and unconscientious advantage is taken of another. *Bachrach v. Washington United Cooperative,* 181 Md. 315, 322, 29 A. 2d 822, 826. The chancellor found that Mrs. McKenna's letter did not add anything to the facts which decedent's children and grandsons had known for many years. Moreover, as the chancellor said, even if all of the property had been given to the four daughters, it would not be an unusual act for them to permit other members of the family to take such things as they desired.

Complainant also urged that the grandsons were minors at the time of the division and had no knowledge of the facts creating their cause of action. But Boston

3d, born in 1900, became of age 23 years before the institution of this suit. His brothers, George and Leo, are only a few years younger. Boston 3d admitted that he had known for years that his aunts and uncles were given various articles from his grandfather's home. In fact, Mrs. McKenna said in her letter that Boston 3d went to the home when the division was made and got some of the furniture for his mother. There can be no doubt that the grandsons knew that the division of the property had been a bone of contention in the Fear family for a generation. Mrs. Thomas testified that Boston 3d complained to her on a number of occasions that he "had not gotten anything from his grandfather's estate."

The conclusion is inevitable that, inasmuch as complainants failed to prove fraud, defendants can invoke the doctrine of laches. This doctrine is based upon the ground of public policy, which requires the discouragement of stale demands. Equity considers that deliberate delay or gross negligence constitutes an implied waiver arising from a knowledge of the conditions and an acquiescence in them. *Hoffa v. Hough*, 181 Md. 472, 30 A. 2d 761; *Young v. Cockman*, 182 Md. 246, 34 A. 2d 428, 149 A. L. R. 1006; *Kaufman v. Plitt*, 191 Md. 24, 59 A. 2d 634. In Maryland the statute demands (1) that in every case in which letters of administration are granted, an inventory shall be returned within three months from the date of the letters of administration, unless further time shall be granted by the Orphans' Court; and (2) that every administrator shall render the first account of his administration within twelve months from the date of letters. Code 1939, art. 93, §§ 1, 212, 220. In the case before us we find that one of decedent's sons was appointed administrator by the Orphans' Court of Baltimore City in 1919, but he never filed either an inventory or an account up until the time of his death in 1944.

It is true that the doctrine of laches can be invoked only where there has been a delay which has caused prejudice to the party against whom relief is sought.

*Curtis v. Maryland Baptist Union Ass'n,* 176 Md. 430, 5 A. 2d 836, 121 A. L. R. 1516; *Kaufman v. Plitt,* 191 Md. 24, 59 A. 2d 634. From the record here we find that Leonora Thomas' husband, who made the first investigation of the estate 30 years ago, is dead, and Mary Leckner has become insane. Moreover, many of the pieces of furniture and bric-a-brac have passed into the hands of *bona fide* purchasers. Accordingly it is beyond question that defendants have been prejudiced by the long delay.

For these reasons we will affirm the decree of the chancellor dismissing the bill of complaint.

*Decree affirmed, with costs.*