756 A.2d 963

**FREDERICK ROAD LIMITED PARTNERSHIP, et. al.**

v.

**BROWN & STURM, et. al.**

**No. 93, Sept. Term, 1998.**

Court of Appeals of Maryland.

July 27, 2000.

Reconsideration Denied Sept. 6, 2000.

78

Albert D. Brault (Joseph P. Morra, Brault, Graham, Scott & Brault, LLC, on brief), Rockville, for petitioners.

Charles E. Iliff, Jr. (Stephan Y. Brennan, Iliff & Meredith, P.C., on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL JJ.

BELL, Chief Judge.

The petitioners, Frederick Road Limited Partnership and Fannie Lois Aschenbach, brought this legal malpractice action in the Circuit Court for Montgomery County against the respondents, Brown & Sturm, R. Edwin Brown, P.A., The Peach Tree Road Investment Co.,[1] Rex L. Sturm, P.A., R. Edwin Brown, Esquire, and Rex L. Sturm, Esquire. The circuit court granted the respondents' motion for summary judgment on the grounds that the petitioners' law claims were barred by the applicable statute of limitations and their equity claims were barred by laches. A divided panel of the Court of Special Appeals affirmed. *Frederick Road Limited Partnership v. Brown and Sturm,* 121 Md.App. 384, 710 A.2d 298 (1998). This Court granted certiorari to address two issues: whether the trial court erred in granting summary judgment by determining, as matter of law, that the petitioners were on notice that their losses were caused by the legal malpractice or fraud committed by their attorneys and whether the trial court erred in granting summary judgment on the grounds that the petitioners' contract claims were barred by statute of limitations and their equitable claim precluded by the doctrine of laches.

We shall hold that summary judgment in this case was inappropriate. Accordingly, we shall reverse the judgment of the Court of Special Appeals.

---

* Chasanow, J. now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. The Peach Tree Road Investment Company was the corporate title of R. Edwin Brown, PA. When this suit was filed, the Peach Tree Investment Company had forfeited its charter.

I.

In 1981, with the goal of minimizing potential estate and gift taxes, Mr. W. Lawson King and Mrs. Cordelia E. King ("the Kings") sought to transfer 438 acres of farm land in Montgomery County, known as the "King Farm," to their three children. To accomplish this goal, the Kings sought legal advice from the respondent, R. Edwin Brown, Esquire, ("Brown"), a Montgomery County real estate attorney, who had been engaged in the private practice of law for more than thirty (30) years with a primary focus in condemnation and other land valuation cases. Mr. King had known Brown since high school, and Brown had previously represented Mr. King in a land condemnation case in the 1970's. The Kings also sought accounting and financial advice from their certified public accountant, Mr. August C. Bonsall ("Bonsall").

Brown and Bonsall began working together to estimate the value of the land and calculate the potential taxes. Bonsall believed the value of the King Farm was between $20 million and $100 million. Brown believed that the King Farm could be valued at much less and result in significant tax savings, if the farm were appraised using a "farm-use only" valuation. Brown therefore, after procuring three appraisals of the King Farm, each of which, at his instruction, valued the property for "farm-use only," received estimates for the farm at between $515,000 and $720,000. To justify this price under the various tax codes, Brown proposed that the Kings place a three-year "farm-use only" easement on the property. This method, he assured the Kings and their children, would comply with applicable provisions of the federal and local tax codes, and result in significant tax savings.

Bonsall discussed the accounting and legal particulars of the plan with G. Van Velsor Wolf, Esquire ("Wolf"), whom he contacted for that purpose. The Kings had often consulted Wolf for legal and estate planning advice. Wolf disagreed with Brown's advice, calling it "badly flawed" from an estate planning perspective. Thereafter, Wolf and members of his law firm, Piper & Marbury, met with Mr. King to discuss

alternatives to the plan and to explain their view that any taxes would be based, not on the value of the land with the temporary agricultural easement, but on the "fair market value" of the farm at its "highest and best use." Wolf proposed several alternative plans, finally advising Mr. King that a charitable lead trust would be the most advantageous estate-planning vehicle. Mr. King authorized Wolf to prepare such a trust for his consideration.

After being informed that Mr. King had consulted with Wolf, who disagreed with his plan, Brown met with Mr. King and reassured him that selling the property with a farm-use only easement would be legitimate under the tax codes and, what's more, would be the most beneficial method, from a tax savings perspective, of transferring the land. Persuaded by Brown, and without notice to Wolf or his law firm, the Kings decided to proceed with Brown's advice.[2] Thus, on February 5, 1982, King executed a deed transferring approximately 418 [3] acres of the King Farm to two limited partnerships created by the King children: (1) Frederick Road Limited Partnership, for which the petitioner, Mrs. Aschenbach, served as general partner; and (2) Field Farms Limited Partnership, for which the Kings other children served as general partners.[4] The total sale price was $596,942.95, representing the average of the three "farm-use only" appraisals.

Mr. King subsequently discharged Wolf as the couple's attorney. In reply, Wolf wrote a lengthy letter to Mr. King, with a copy to Brown, expressing concern about the potential tax consequences of the property transfer transaction. Wolf believed that the fair market value of the farm could be between $27 million and $54 million and that the sale could

---

2. Brown, perhaps to address the Kings' concerns, extended the three-year agricultural easement to five-years.

3. The contract covered 418 acres out of the 438 acre farm because Mr. King wanted to retain the family home and a surrounding 20 acres temporarily.

4. William King and Elizabeth Jacobs, the general partners of Field Farms Limited Partnership, are not parties to this appeal.

lead to serious tax consequences. In the letter, Wolf explained:

"[A]s of the present moment I either know or have every reason to believe that the property you recently transferred to your children for $566,434.13 [sic] did not have a "fair market value"—which is the test under all three of the federal tax laws, to wit, income, gift and estate—of that amount or anywhere near it. On the contrary, . . . the true value of that land for federal estate tax purposes is far, far in excess of $1,500 an acre.

"I have been advised by a very knowledgeable, experienced and responsible person who is wholly familiar with the property . . . that at the very least the "home farm" as transferred to the children is worth $1.50 a square foot or $65,340 an acre. That is, for 418 acres the minimum federal income tax valuation might well be in the neighborhood of $27,312,000.

\* \* \* \*

"According to our figures if the Internal Revenue Service should use what I was advised to be a "realistic" value of the property per acre, that is $3.00 per square foot, or a total of $54,624,240, the federal gift tax which you and Mrs. King would have to come up with would be approximately $33,943,000 in cash. . . ."

After receiving the letter, the Kings and their children immediately called a meeting with Brown to discuss Wolf's concerns. Again, however, Brown unequivocally assured them that the transaction as he proposed it was legitimate and that Wolf's warnings were simply a difference of professional opinion.

Soon after the sale, however, Brown had difficulty recording the deed in the Montgomery County land records. Montgomery County officials believed that the sale price, upon which the County transfer tax would be imposed, was far below the fair market value of the farm. An Assistant County Attorney advised Brown that the State Department of Assessment and

Taxation ("SDAT") had appraised the farm, as of March 16, 1982, without improvements, at approximately $9 million. Despite the SDAT appraisal, Brown again assured the Kings that the transaction was legitimate and that the problems with the county would be resolved without the payment of additional taxes. Brown's advice soon proved to be correct; thereafter, Brown successfully recorded the deed in the county records without either modifying the sale price or paying any additional taxes. Thus, in December of 1982, with confidence in Brown's advice, the Kings conveyed the remaining 20–acre homestead to their children for the stated consideration of $248,100, again based upon the farm-use only appraisals.

Mrs. King died in 1983 and Mr. King in 1985. Soon after their deaths, the IRS began investigating the property transfer transaction. Brown, on behalf of the King children, responded to the IRS inquiries, at all times defending the transaction as legitimate. In July and August of 1987, however, the IRS issued a deficiency assessment, totaling more than $68 million in taxes and penalties, against the estates of the Kings, as well as the King children. The IRS stated that the "underpayment of tax" was "due to a valuation underpayment which was less than 40 percent of the correct value." The King children, however, were not particularly concerned about the deficiency notices because Brown had told them to expect an IRS challenge. At the same time, Brown advised them that the challenge would be resolved without the payment of additional taxes.[5]

Brown represented the King children in the tax matter on a

---

5. The affidavit of Conrad V. Aschenbach, spouse of the petitioner, F. Lois Aschenbach, states:

"When the notices of deficiency were issued, the family was not unduly concerned, because Mr. Brown had indicated that a challenge by the Internal Revenue Service was a possibility, and that he had been prepared all along to address the issue, should it arise. Upon receipt of the notices of deficiency, Mr. Brown once again reassured the family that the transaction was legitimate, and that the controversy with the Internal Revenue Service would be resolved without the payment of additional taxes."

reverse contingency basis.[6] Because Brown had never argued a case in the federal tax court, he requested and received permission from the King children to hire Charles Burton, Esquire ("Burton"), an experienced tax litigator. The King children agreed to compensate Burton at $125 per hour. The King children also agreed to hire four independent appraisers to retroactively assess the "fair market value" of the property. When completed, each appraisal was substantially higher than Brown's pre-sale estimates and substantially lower than Bonsall and Wolf's pre-sale estimates. The four appraisers assessed the fair market value of the King Farm at $6.2 million, $10.4 million, $5.1 million, and 4.9 million, respectively, averaging approximately $6.7 million. Both Brown and Sturm believed that these appraisals were good and would stand up at the trial in tax court, but they did not abandon their primary position that the original land valuation plan was legally correct.

In December of 1988, two weeks before the scheduled trial in tax court, Brown advised the King children to settle the case for $20 million in taxes and penalties. Brown's sole reason for this advice was that the IRS files contained a copy

---

6. On July 21, 1987, the King children retained Brown & Sturm to represent them before the IRS. At that time, however, no oral or written agreement was made regarding Brown & Sturm's fee for the representation. Without clarifying the fee arrangement with the King children, Brown & Sturm provided legal services that included, consulting extensively with tax counsel regarding many aspects of the litigation, preparing pleadings for filing in the U.S. Tax Court, and reviewing IRS pleadings in the litigation. Subsequently, Brown proposed that the King children pay his law firm an eight percent (8%) interest in revenues generated by the King Farm in perpetuity for his representation of them in federal tax court. In a letter dated September 11, 1987, the King Children rejected this proposal. Instead, the King children asked Brown to bill them on an hourly basis. Brown refused, insisting on a reverse contingency fee agreement to which, in January of 1988, the King children ultimately agreed. Under the terms of the reverse contingency agreement, the King children agreed to pay Brown and his law firm ten percent (10%) of the difference between the deficiency assessment and penalties and the amount of taxes that were ultimately paid, if any. In addition, the King children agreed to pay Brown and his law firm five percent (5%) of any reduction in penalties assessed for alleged fraud.

of the June 30, 1982 letter from Wolf, and Brown believed that this compromised all of his defenses. Neither Burton, the King children's tax attorney, nor Brown attempted to challenge the admissibility of the letter in tax court. Moreover, at no time during the representation in tax court or thereafter did Burton or Brown advise the King children that they may have a cause of action against Brown for negligent advice. Later that month, the King children decided to take Brown's advice and settled with the IRS for the recommended $20 million.[7] Pursuant to the reverse contingency agreement, the settlement resulted in legal fees owed to Brown and his law firm in excess of $4.8 million.[8] The King children also owed Burton $30,000.

---

7. The settlement resulted in a compromised gift tax liability of approximately $10 million and $10 million allocated to interest. This amount was much less than the tax amount predicted by Wolf in his June 30, 1982 letter, "minimum"($27,312,000) and "realistic" ($33,943,000), and obviously much more than that predicted by Brown.

8. At that time, however, the King children were unable to pay Brown's legal fee. Thus, on March 2, 1989, the parties executed an addendum to the retainer agreement, by which the King children agreed to pay ten percent (10%) per annum interest to defer the fee. Over the next several years, the King children paid Brown & Sturm approximately $1.6 million, all of which was credited to interest.

While this appeal was pending, the respondents brought suit against the petitioners in the Circuit Court for Montgomery County to collect the $4.8 million in legal fees plus all interest due under the agreement. On February 17, 2000, finding: (1) that a confidential relationship existed between the respondents and the petitioners at the time that the Retainer Agreement was executed; (2) that the respondents attempted to take "unfair advantage of the [petitioners] by overreaching;" (3) that the respondents were "coercive in nature and deprived the [petitioners] of the ability to choose a fee agreement that was in their best interest;"(4) that the respondents "acted contrary to the Rules of Professional Conduct and the standard of professional practice by failing to determine the reasonable exposure of the [petitioners] to tax liability and failing to use that amount as the benchmark figure in the Retainer Agreement;" and (5) that respondents failed to sustain their burden of demonstrating that the fee arrangement was voluntary and fair, the Circuit Court for Montgomery County entered judgment in favor of the defendants. *Brown & Sturm, et al. v. Frederick Road General Partnership, et al.*, Civil No. 158302, Memorandum Opinion and Order, (Mont.County, Feb.17, 2000). That judgment is currently on appeal to the Court of Special Appeals.

Brown continued to represent the King children in all matters related to the farm, including assisting them with borrowing $20 million, from a bank, secured by the King Farm to pay the IRS, and assisting with the establishment of an $11 million line of credit to service the debt. The attorney's fees and bank loan were to be satisfied from the proceeds of the sale of the King Farm, of which Brown & Sturm was the sole agent for receipt of offers or plans for purchase, and controlled all negotiations concerning disposition of the King Farm. Additionally, Brown recommended that the King children retain yet another attorney, Bayard Z. Hochberg ("Hochberg"), to institute a legal malpractice claim against Wolf and Piper & Marbury. As Brown viewed it, the release of the letter to the IRS by Wolf or members of his law firm, was a breach of the attorney-client privilege and the direct and proximate cause of the $20 million in damages sustained by the King children. Following Brown's assurances, the King children hired Hochberg and filed the malpractice claim against Wolf and Piper & Marbury in the Circuit Court for Montgomery County.

Brown remained actively involved with Hochberg in the malpractice suit against Wolf and Piper & Marbury. Hochberg's initial engagement letter was actually addressed to Brown & Sturm, and Hochberg's first meeting on the malpractice matter was with Brown. Moreover, much of Hochberg's investigation was based upon information provided to him from Brown & Sturm's files. Hochberg also sent Brown & Sturm the original complaint for review and comment before filing. At no time did Hochberg, Brown, or any member of Brown & Sturm inform the King children that they may have a cause of action against Brown individually or against the law firm of Brown & Sturm.

In May of 1991, the attorney representing Wolf and Piper & Marbury, George Beall, Esquire ("Beall"), sent Hochberg a letter stating, among other things, that Wolf and Piper & Marbury had done nothing wrong, and that if the King children were harmed in any way it was the result of Brown & Sturm's bad advice and estate counseling. Hochberg sent a

copy of the letter to Brown, but neither Brown nor Hochberg shared this letter with the King children.

On October 21, 1992, the Circuit Court for Montgomery County granted Wolf and Piper & Marbury's motion for summary judgment. That court reasoned that Wolf's letter would have been inadmissible in the federal tax case, and that, even if it were admissible, the letter was not the legal cause of any damage suffered by the King family. Instead, the circuit court strongly suggested that the damages sustained by the King children were the result of two things: 1) Brown & Sturm's bad advice, dating back to the inception of the property transfer sale in 1981; and 2) Brown's failure to object to the admissibility of the letter before the tax court. Specifically, with reference to the admissibility of the letter, the trial judge, Judge Messitte, opined: "[B]y the slightest exertion of effort by Plaintiffs or their counsel, they could have prevented the document from ever coming into evidence in the first place." *See King v. Davis*, Civ. No.82446, slip opinion at 13 (Cir. Ct. Montgomery County, Oct. 21, 1992). The petitioners noted a timely appeal to the Court of Special Appeals. Adopting the reasoning of the trial court, that court, in an unreported opinion, affirmed the summary judgment order.[9]

The King children subsequently discharged Brown & Sturm as their attorneys and, in May of 1995, almost seven years after the final settlement with the IRS, filed the present cause of action in the Circuit Court for Montgomery County. In it, they sought damages for the respondents' legal malpractice, fraud, civil conspiracy, breach of fiduciary duty, and aiding and abetting.[10] They also sought equitable relief; in particu-

---

**9.** The petitioners in the case *sub judice* did not participate in that appeal. It was brought by William I. King and Elizabeth Jeanne Jacobs, the other two King children, as well as representatives of the Kings' estates and the trustees under trusts created by the wills of W. Lawson King and Cordelia E. King.

**10.** Bonsall and his accounting firm were also named as defendants in this action. In September of 1996, the court granted their motion for summary judgment and dismissed the petitioners' claims against them. Petitioners do not appeal from that order.

lar, the rescission of the retainer agreement, including subsequent amendments to that agreement.

The Circuit Court granted the respondents' motion for summary judgment on all counts, ruling that all were barred by the applicable statute of limitations and/or by laches. The court reasoned:

"[The King children] necessarily knew at [the] point of final settlement [with the IRS] that the representations and promises made by [Brown & Sturm] regarding avoidance of additional taxes had not and would not ever be realized."

"In short the undisputed facts indicated that [the King children] were or should have been put on notice, at least at that point in time [when they settled with the IRS for $ 20 million] such that a reasonable person would have made reasonable inquiry as to the cause of action against [Brown & Sturm]."

A divided Court of Special Appeals affirmed. *Frederick Road Limited Partnership et. al., v. Brown & Sturm, et al.,* 121 Md.App. 384, 710 A.2d 298 (1998). The majority of that court reasoned:

"[T]he conclusion is inescapable that the court properly granted summary judgment. Once appellants settled the tax case, they had actual knowledge of sufficient material facts giving rise to their claims against appellees. Appellants' attempt to 'shoot the messenger,' by filing suit against Wolf and Piper [ & Marbury] for allegedly exposing appellees' flawed tax strategy, did not toll the statute of limitations. Appellants' reasoning as to inquiry notice is plainly flawed; they stretch the discovery rule beyond its breaking point."

*Id.* at 408–409, 710 A.2d at 310. As to the equitable claims, that court held:

"[W]e agree with the trial court that appellants' equitable claim should have been brought within three years of appellants being placed on inquiry notice of the facts and circumstances underlying the claim. Therefore, we hold that the

trial court was correct in concluding that laches barred appellants' equitable claim for rescission."

One judge dissented on the basis that a reasonable juror could find that the respondents "created a smoke screen to obscure their own potential liability." *Id.* at 423, 710 A.2d at 317 (Kenney, J. dissenting). He concluded:

"This does not appear to be a situation in which appellants truly slumbered, but if they have, an inference could be drawn that they were purposely lulled to sleep, if not sedated, by extended and diversionary litigation encouraged by [the respondents]."

*Id.* at 425, 710 A.2d at 318.

The petitioners' motion for reconsideration was denied. Thereafter, the petitioners timely filed a Petition for Writ of Certiorari, which we granted to consider the important issues this case presents.

## II.

In this Court, the petitioners contend that the intermediate appellate court erred in affirming the trial court's grant of summary judgment on limitations and laches grounds. They argue that there are genuine issues of material fact which the trier of fact must resolve, *i.e.,* as to when they knew or should have known that their losses were caused by the respondents' legal malpractice or fraud. They contend:

"At all times during this attorney-client relationship, [the petitioner] and her siblings placed complete trust and confidence in Brown & Sturm, and relied wholeheartedly upon Brown & Sturm's advice. Until Judge Messitte issued his opinion in the legal malpractice case against Wolf and Piper & Marbury, [the petitioner and her siblings] never realized, nor understood, the malpractice and deception perpetrated by [the respondents] throughout the course of their representation of [the petitioners], believing instead that Wolf and Piper & Marbury had committed the malpractice."

Alternatively, the petitioners urge this Court to adopt the "continuous representation rule." This is a rule, they argue, that many states have adopted to toll the statute of limitations in legal malpractice actions until the legal representation is complete, even when the client may be aware of the attorney's negligence. Citing *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 337–338, 635 A.2d 394, 401 (1994), they argue that the continuous representation rule is a natural corollary to the "continuous course of treatment rule" as applied in medical malpractice cases. Further, relying on *Desser v. Woods*, 266 Md. 696, 708–709, 296 A.2d 586, 593 (1972) and *Herring v. Offutt*, 266 Md. 593, 600–601, 295 A.2d 876, 880–81 (1972), the petitioners submit that the continuous representation rule "embodies the principle that one dealing with a fiduciary has no 'duty to make inquiry that the confidential relationship has been abused during the continuation of that relationship,'" a standard that should be applied in this case.

The petitioners assert that, in any event, the trial court erred in granting summary judgment in favor of the respondents on the grounds that the contract claims were barred by limitations and the equitable relief was precluded by the doctrine of laches. In urging this Court to reverse the judgment of the Court of Special Appeals, they argue:

"[t]here is no justice in allowing Brown & Sturm to: provide negligent advice to their clients; cause millions of dollars in damages; deliberately create diversionary litigation to prevent the discovery of their own wrongdoing; seek shelter from redress by asserting a statute of limitations defense, and at the same time, be able to sue the very clients they so egregiously harmed for approximately $8 million in attorney fees and interest (after having paid approximately $1.6 million), because they made the retainer agreement a specialty."

The respondents see it much differently. They argue that the trial court and the intermediate appellate court reached the correct result. As they see it, an action is deemed to accrue on the date when the plaintiff knows, or with the exercise of reasonable diligence, reasonably should have

known of the wrong. Maintaining that they are innocent of malpractice and fraud, they contend that in 1982, 1985, 1987, and 1988, there were "several discrete events" that were sufficient to put the petitioners on "inquiry notice" of a potential cause of action. Moreover, they argue that the circuit court's summary judgment order on the grounds that the petitioners' law claims were barred by the statute of limitations and the equity claims by laches is especially appropriate where "three important witnesses are dead: Lawson King, Cordelia King and G. van Velsor Wolf."

The respondents also argue that, even if this Court were to apply the "continuous representation rule" in this case, the petitioners' cause of action would still fail because, as they see it, the petitioners have ignored the parameters of the "continuous course of treatment" rule. The respondents argue that, when a patient or client learns or should have learned of the harm resulting from the alleged malpractice during the course of the physician/patient or attorney/client relationship, the statute of limitations runs from the time that knowledge, actual or constructive, is acquired, and is not tolled until the relationship ends. Moreover, they contend that, because the petitioner hired a new attorney, namely Hochberg, to represent them in the legal malpractice claim against Wolf and Piper & Marbury, the representation was not "continuous" and, therefore, the rule simply does not apply.[11]

We agree with the petitioners. Without presupposing that the respondents have engaged in malpractice or any other wrongdoing, our review of the record in this case reveals sufficient facts to generate a genuine dispute of material fact and, thus, a jury issue, on the key elements of whether, and

---

11. The respondents also argue that the petitioners did not preserve for appellate review the issue relating to the applicability of the "specialty" statute of limitations, and that the intermediate appellate court was correct when it held that, even if the issue were preserved, the petitioners' argument lacked merit. Having concluded that a material issue of fact exists as to whether the petitioners were on notice of a cause of action, we need not and, therefore, shall not address whether the statute of limitations for a specialty is applicable in this case.

when, the petitioners were on notice of a cause of action against the respondents and whether, once on notice, the petitioners acted diligently to protect their rights. Therefore, we shall reverse.

### III.

Summary judgment practice in this state is governed by Maryland Rule 2–501. It states, in relevant part, "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to summary judgment as a matter of law." Rule 2–501(e). Summary judgment is not a substitute for trial. *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 205, 680 A.2d 1067, 1077 (1996). The function of the trial court at the summary judgment stage is to determine whether there is a dispute as to a material fact sufficient to require an issue to be tried. *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Foy v. Prudential Insurance Company of America et al.,* 316 Md. 418, 422, 559 A.2d 371, 373 (1989); *Coffey v. Derby Steel Company,* 291 Md. 241, 247, 434 A.2d 564, 568 (1981). Thus, an appellate court's review of the grant of summary judgment involves the determination whether a dispute of material fact exists, *Gross,* 332 Md. at 255, 630 A.2d at 1160; *Beatty v. Trailmaster Products,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993), and "whether the trial court was legally correct." *Heat & Power Corporation v. Air Products & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202, 1206 (1990) (citations omitted). Evidentiary matters, credibility issues, and material facts which are in dispute cannot properly be disposed of by summary judgment. *See Pittman v. Atlantic Realty Co.,* 359 Md. 513, 536, 754 A.2d 1030, 1042 (2000) (recognizing that "Maryland law . . . has not viewed the function of summary judgment to be determining whether an issue is genuine based on credibility."); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Merchants Mtg. Co. v. Lubow,* 275 Md. 208, 217, 339 A.2d 664, 670 (1975).

Instead, a trial court reviewing a motion for summary judgment must ask whether there exists a genuine dispute as to a material fact and, if not, what the ruling of law should be upon those undisputed facts. *Brewer v. Mele,* 267 Md. 437, 442, 298 A.2d 156, 160 (1972). If the facts are susceptible of more than one inference, the materiality of that arguable factual dispute must be judged by looking to the inferences that may be drawn in a light most favorable to the party against whom the motion is made and in the light least favorable to the movant. *Id.; Dietz v. Moore,* 277 Md. 1, 4–5, 351 A.2d 428, 431 (1976); *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 326, 389 A.2d 887, 904–905 (1978).

A grant of summary judgment is appropriate where the statute of limitations governing the action at issue has expired. Maryland Code (1973, 1998 Repl.Vol.) § 5–101 of the Courts and Judicial Proceedings Article [12] provides that "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." This section reflects the General Assembly's judgment of what constitutes an adequate time for a person of ordinary diligence to bring an action and is intended to promote fairness and judicial economy. *Pennwalt Corp. v. Nasios,* 314 Md. 433, 437, 550 A.2d 1155, 1157–1158 (1988); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). In *Pierce, supra,* this Court explained:

"The adoption of statutes of limitation reflects a policy decision regarding what constitutes an adequate period of time for a person of reasonable diligence to pursue a claim. Such statutes are designed to balance the competing interests of each of the potential parties as well as the societal interests involved. Thus, one of the purposes of such statutes is to assure fairness to a potential defendant by providing a certain degree of repose. This is accomplished

---

**12.** Unless otherwise indicated, all references are to Maryland Code (1973, 1998 Repl.Vol.) of the Courts and Judicial Proceedings Article.

by encouraging promptness in prosecuting actions; suppressing stale or fraudulent claims; avoiding inconvenience that may stem from delay, such as loss of evidence, fading of memories, and disappearance of witnesses; and providing the ability to plan for the future without the uncertainty inherent in potential liability. Another basic purpose is to prevent unfairness to potential plaintiffs exercising reasonable diligence in pursuing a claim. Still another purpose is to promote judicial economy."

296 Md. at 665, 464 A.2d at 1026. *See also, Pennwalt, supra,* 314 Md. at 437, 550 A.2d at 1157–1158.

Yet the question of accrual in § 5–101 is left to judicial determination. *Pierce, supra,* 296 Md. at 664, 464 A.2d at 1025; *United Parcel v. People's Counsel,* 336 Md. 569, 579, 650 A.2d 226, 231 (1994); *Poffenberger v. Risser,* 290 Md. 631, 633, 431 A.2d 677, 679 (1981); *Goldstein v. Potomac Elec. Power Co.,* 285 Md. 673, 684, 404 A.2d 1064, 1069 (1979); *Harig v. Johns–Manville Products,* 284 Md. 70, 75, 394 A.2d 299, 302 (1978). This determination may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied. *Poffenberger, supra,* 290 Md. at 634, 431 A.2d at 679. As this Court explained in *Pierce, supra:*

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. Thus, the determination of when a cause of action accrues is properly made with reference to the rationale underlying statutes of limitation."

*Id.* at 664–665, 464 A.2d at 1025–1026. (citations omitted).

Recognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury, this Court has adopted the discovery rule to determine the date of accrual. *Hahn v. Claybrook,* 130 Md. 179, 186–187, 100 A. 83, 85–86 (1917). The discovery rule tolls the accrual of the limitations period until the time the plaintiff

discovers, or through the exercise of due diligence, should have discovered, the injury. Thus, before an action is said to have accrued, a plaintiff must have notice of the nature and cause of his or her injury. *See, Pennwalt, supra,* 314 Md. at 453, 550 A.2d at 1165–1166 (holding that limitations do not begin to run until a plaintiff knows or reasonably should know the nature and cause of his or her harm.). *See also, United Parcel, supra,* 336 Md. at 579, 650 A.2d at 231 (holding that "a cause of action 'accrues' within the meaning of § 5–101 when 'the plaintiff knows or should know of the injury, its probable cause, and ... [the defendant's] wrongdoing ....' ")(*citing Hecht, supra,* 333 Md. at 336, 635 A.2d at 400). Aware that the question of notice generally requires the balancing of factual issues and the assessment of the credibility or believability of the evidence, this Court in *O'Hara v. Kovens,* 305 Md. 280, 503 A.2d 1313 (1986), made clear:

> "whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury."

*Id.* at 294–295, 503 A.2d at 1320. (citations and internal quotations omitted).

 Today, the discovery rule ordinarily applies to all actions where limitations are governed by the three year statute of limitations, *see, Poffenberger, supra,* 290 Md. at 635, 431 A.2d at 679, and has long applied in all manners of malpractice litigation. *See, e.g., Callahan v. Clemens,* 184 Md. 520, 41 A.2d 473 (1945)(negligent design and construction); *Waldman v. Rohrbaugh,* 241 Md. 137, 215 A.2d 825 (medical malpractice). *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972) (accountant malpractice); *Steelworkers Holding v. Menefee,* 255 Md. 440, 258 A.2d 177 (1969) (architect malpractice); *Mattingly v. Hopkins,* 254 Md. 88, 253 A.2d 904 (1969) (civil engineer malpractice); *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969) (attorney malpractice).

Maryland has also recognized the "continuation of events" theory, a corollary accrual doctrine, which serves to toll the statute of limitations where a continuous relationship exists between the parties. For example, in *W., B. & A. Elec. R.R. Co. v. Moss*, 130 Md. 198, 100 A. 86 (1917), a case involving compensation for services for an extended time, we said that

> "in cases where there is an undertaking which requires a *continuation of services*, or the party's right depends upon the happening of an event in the future, the statute begins to run only from the time the services can be completed or from the time the event happens."

*Id.* at 204–205, 100 A. at 89. (emphasis added). Similarly, in *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941), where an employee sued his employer on an agreement to share profits, we said that

> "[w]here a contract does not mention the period of employment, and the claim of the employee is based upon '*continuous employment*,' indicating one entire contract, even though the work may be interrupted from time to time, the statute will not run until the completion of the contract."

*Id.* at 374, 19 A.2d at 189. (citation omitted) (emphasis added). Moreover, in *Waldman v. Rohrbaugh*, 241 Md. 137, 215 A.2d 825 (1966), a case involving a continuous course of treatment by a physician we noted that

> "if the facts show *continuing medical or surgical treatment* for a particular illness or condition in the course of which there is malpractice producing or aggravating harm, the cause of action of the patient accrues at the end of the treatment for that particular illness, injury or condition, unless the patient sooner knew or reasonably should have known of the injury or harm...."

*Id.* at 142, 215 A.2d at 828 (emphasis added).[13] The reasoning underlying each of these cases is that a relationship which is

---

**13.** By the enactment of Maryland Code (1973, 1998 Repl.Vol.) § 5–109 of the Courts and Judicial Proceedings Article, the General Assembly

built on trust and confidence generally gives the confiding party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist. The confiding party, in other words, is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious.

Fraud perpetrated by an adverse party may also serve to postpone the accrual date of a cause of action. *See* § 5-203 of the Courts & Judicial Proceedings Article. That section provides:

> "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."

This section is remedial in nature. *See, Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 323–324, 545 A.2d 658, 669 (1988). It was passed by the General Assembly for the purpose of enabling the plaintiff in an action at law to set up the fraud of the defendant in order to avoid a plea of limitations. *Piper v. Jenkins,* 207 Md. 308, 315, 113 A.2d 919, 922 (1955); *Herring v. Offutt,* 266 Md. 593, 599, 295 A.2d 876, 880 (1972). Section 5-203 does not require that the defendant commit a fraud distinct from that initially committed for the purpose of keeping the plaintiff in ignorance of his or her cause of action. Instead, by its own terms, § 5-203 is made to apply in those cases where two conditions are met: (1) the plaintiff has been kept in ignorance of the cause of action by

---

has abrogated the common law continuous course of treatment rule as it relates specifically to medical malpractice claims. *Hill v. Fitzgerald,* 304 Md. 689, 698, 501 A.2d 27, 31–32 (1985). Section 5-109 provides, in pertinent part:

(a) *Limitations.*—An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3-2A-01 of this article, shall be filed within the earlier of:

(1) Five years of the time the injury was committed; or

(2) Three years of the date the injury was discovered.

the fraud of the adverse party, and (2) the plaintiff has exercised usual or ordinary diligence for the discovery and protection of his or her rights. *See, Piper v. Jenkins,* 207 Md. at 318, 113 A.2d at 924 (1955); *Mettee v. Boone,* 251 Md. 332, 338–339, 247 A.2d 390, 394 (1968). As to the latter, this Court, in *O'Hara, supra,* explained:

"Notice is not limited to actual knowledge of the fraud. Nor does it mean discovery of proof which, if believed, would, in the opinion of counsel, take the case to the jury on the merits. It is not limited to admissible evidence. . . .

"[B]eing 'on notice' means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged fraud."

305 Md. at 301–302, 503 A.2d at 1324.

■■■ Consistent with the continuation of events theory and the General Assembly's intention that the statute of limitations for fraud be tolled, this Court in *Herring, supra,* held that, where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may toll the statute of limitations, if: (1) the relationship continues unrepudiated, (2) there is nothing to put the injured party on inquiry, and (3) the injured party cannot be said to have failed to use due diligence in detecting the fraud. 266 Md. at 600–601, 295 A.2d at 880–881. Of particular relevance to the case *sub judice,* the *Herring* Court pointed out that a confidential relationship, by its nature, gives the confiding party the right to relax his or her vigilance to a certain extent and rely on both the good faith of the other party and that party's duty to disclose all material facts and, as a result, the confiding party has no duty to make inquiries until something occurs to make him or her suspicious. *Id.* The result is different, however, if the confiding party acquires actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or comes into possession of facts which put him or her upon inquiry notice, which, if pursued,

would have disclosed the abuse. In that event, the applicable statute of limitations runs from the time the confiding party receives actual knowledge or the facts which placed him or her upon inquiry notice. *Id.* In *Herring,* this Court made clear that, whether the plaintiff's failure to discover the cause of action was due to a failure to exercise due diligence or to the defendant's concealment of his or her wrongdoing, ordinarily is a question for the jury. *Id.* at 599, 295 A.2d at 880; *See also, New England Mut. Life Ins. Co. v. Swain,* 100 Md. 558, 574, 60 A. 469, 472 (1905); *O'Hara, supra,* 305 Md. at 301 503 A.2d at 1323–1324.[14]

Reiterating what we explicated in *Herring,* this Court, in *Desser v. Woods,* 266 Md. 696, 296 A.2d 586 (1972), explained:
"When a confidential relationship is established, the burden is then upon the trusted party to show that the challenged transaction was freely, fairly made and that no unfair or unreasonable advantage was taken of the confiding party in the confidential relationship. *Owings v. Owings,* [233 Md. 357, 363, 196 A.2d 908, 911]; *Upman v. Thomey,* [145 Md. 347, 361–362, 125 A. 860, 864]; 26A C.J.S. Deeds § 193, at 53 (1956).

"Nor is the confiding party under any duty to make inquiry to discover that the confidential relationship has been abused during the continuation of that relationship. *See Herring v. Offutt,* [266] Md. [593], 295 A.2d 876 (1972) and cases cted [sic] therein. *See also Scoville v. Brock,* 76

14. Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. *See, Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 323–324, 389 A.2d 887, 904 (1978). Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, *see, Walsh v. Edwards,* 233 Md. 552, 557, 197 A.2d 424, 426–427 (1964); *Fegeas v. Sherrill,* 218 Md. 472, 476, 147 A.2d 223, 225–226 (1958), and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known. *Impala, supra,* 283 Md. at 323–324, 389 A.2d at 904.

Vt. 385, 57 A. 967 (1904); 54 C.J.S. Limitations of Actions §§ 194, 198 et seq. (1948).

"If the confiding party, however, has actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or is in possession of facts which put such a party upon inquiry which would disclose such an abuse, then the applicable statute of limitations begins to run at the time of receiving actual knowledge or of facts placing the confiding party upon inquiry; but the burden is upon the trusted party to prove such earlier knowledge. *Grayson v. Fidelity Life Ins. Co.*, 114 S.C. 130, 103 S.E. 477 (1920); 54 C.J.S. Limitations of Actions § 388, at 528 (1948)."

*Id.* at 708–709, 296 A.2d at 593.

In the case *sub judice,* Brown's deposition confirms that his firm maintained an attorney-client relationship with the petitioners from 1981 through 1994, in reference to the King Farm.[15] It is well settled that trust and confidence are basic to the attorney-client relationship. A client is entitled to believe a lawyer who says "I am your lawyer, why not trust me, I am a lawyer, I would not do anything that is wrong." *See, Kornbau v. Evans,* 66 Cal.App.2d 677, 152 P.2d 651, 653

---

**15.** In addition, the affidavit of petitioner, F. Lois Aschenbach, daughter of W. Lawson King, states:

"3. [Respondents] represented me and my siblings without interruption throughout the entire series of events surrounding the transfer of the farm, in the United States Tax Court, and the subsequent law suit against Van Velsor Wolf and Piper & Marbury. I did not terminate my relationship with [respondents] until sometime after Judge Peter J. Messitte issued a written opinion in the law suit against Mr. Wolf and Piper & Marbury. At that time, I refused to participate in an appeal of Judge Messitte's decision, and sought other counsel to represent my interests.

"4. Throughout the period of time that [respondents] represented the family with regard to the transfer of the farm and the events which arose as a result of the transfer, my siblings and I placed trust and confidence in [respondents]. They provided legal advice, which we relied on. Whenever we had questions or concerns about issues which arose, [respondents] assured me and my siblings that they could handle the situation, were working to address or resolve the situation, and that there was nothing to worry about."

(1944) (holding that statute of limitations did not begin to accrue where client relied on assurances from her attorney); *See also, Wille v. Maier,* 256 N.Y. 465, 176 N.E. 841, 842 (1931) (holding that, where attorney-client relationship exists, client was entitled to rely on attorney's statement that, "I am a lawyer, I protect you, I take care of you . . . I protect you in every way"). This Court has noted that a client's right to rely upon his or her attorney's advice is

"founded upon public policy, because the *confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client* and often affords him opportunities to obtain undue advantage by availing himself of the client's necessities, credulity and liberality."

*Hughes v. McDaniel,* 202 Md. 626, 633, 98 A.2d 1, 4 (1953) (emphasis added).

In *Bar Ass'n of Baltimore City v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973), this Court expounded on the importance of trust and confidentiality in the attorney-client relationship. There we explained:

"[A] lawyer's duty is a high one which, because of the nature of the relationship that exists between an attorney and his client, embraces moral standards that are more stringent than those applicable to others. This duty, which is first assumed with the taking of the oath on admission to the bar, is not shed as long as one remains a member of the profession.

"The relationship existing between an attorney and his client is one that of necessity requires mutual trust and confidence. It is of prime importance not only to the parties themselves, but also to lawyers as a group as well as to society in general, that there be no lessening of the degree of confidence that the public has in the fidelity, honesty and integrity of members of the profession. It has been immemorially acknowledged that at the very heart of the attorney-client relationship is the trust concept with the attorney acting as a trustee for his client in all of his undertakings for him."

*Id.* at 518–519, 307 A.2d at 682. Thus, it is clear that the attorney-client relationship requires the attorney to act with the utmost good faith and loyalty, which includes making known to the client all information that is significant and material to the matter that is the subject of the relationship. Notwithstanding the provisions of the Maryland Rules of Professional Conduct on the subject,[16] and, indeed, supplementary thereto, the requirement of good faith and loyalty is deeply rooted in common law and equity principles, *see,* 2 Ronald E. Mallen & Jeffery M. Smith *Legal Malpractice,* § 14.1 (4th ed.1996); *see also Sargent v. Buckley,* 697 A.2d 1272, 1275 (Me.1997); *Santa Clara County Counsel Attys. Assoc. v. Woodside,* 7 Cal.4th 525, 28 Cal.Rptr.2d 617, 869 P.2d 1142, 1154 (1994), and, therefore, must be upheld as a principle that is rightfully relied upon by the public and integral to the proper function of our judicial system. It follows that a client has the right to rely on his or her lawyers' loyalty and to believe the accuracy and candor of the advice they give.

Having concluded that a continuous, confidential relationship existed between the parties in this case, the paramount issue to be decided is whether the petitioners had such knowledge prior to the dismissal of their suit against Wolf and Piper & Marbury as would cause reasonable people in their position to undertake an additional, or more thorough investigation, which, if pursued with reasonable diligence, would have led to discovery of the respondents' wrongdoing and, thus, to an earlier action against the respondents for their alleged

---

**16.** While the Rules of Professional Conduct do not exhaustively delineate every duty to which an attorney in Maryland must follow, a lawyer's duty to disclose significant information and duty to reasonably explain matters is reinforced by Rule 1.4(b). That rule provides:

"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

The comment to Rule 1.4 further defines the lawyer's duty and provides insight into how the rule should be applied. It provides, in part:

"The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interests, and the client's overall requirements as to the character of representation."

malpractice and related wrongdoing. Under the circumstances of this case, we believe that this is a question of fact and, therefore, summary judgment should not have been granted.

The respondents dominated the property transaction, the tax litigation, and the malpractice litigation against Wolf and Piper & Marbury, constantly giving assurances that the property transaction, which is the genesis of this action, was legitimate and would be upheld by the IRS. Later, when the petitioners were required, on the respondents' advice, to settle the tax action for an amount quite a bit more than they had originally been advised that they would have to pay, the respondents maintained that it was Wolf and Piper & Marbury, rather than themselves, who were responsible. To determine whether the petitioners can be said to have been put on notice, the finder-of-fact must be permitted to evaluate the many stages of the events from 1981 to 1994 which led the petitioners to believe that they were harmed by the respondents. We believe, on the record in this case, a finder-of-fact could conclude that it was reasonable for the petitioners, untrained in the law and relying on the fiduciary relationship with their attorneys, to have failed to discover their cause of action against the respondents. This is particularly the case considering that their attorneys' past assurances regarding the legitimacy of the property transfer transaction proved to be accurate, the dispute with Montgomery County tax officials was resolved when the deed to the property was filed without the payment of additional taxes,[17] and, the central issue in the

---

**17.** The affidavit of Conrad V. Aschenbach, spouse of the petitioner, F. Lois Aschenbach, states:

"10. During the time from when Montgomery County refused to record the deed throughout the duration of the litigation involving the Internal Revenue Service, Mr. Brown provided constant assurances that the transaction was a bona fide sale, and that he would solve all of the problems that had arisen since the closing. Mr. Brown frequently used the phrase "no adjustment" to assure me and the family that the controversy would be resolved without having to pay additional taxes.

tax litigation being the valuation of the farm land, that the petitioners knew that Brown was experienced in land valuation cases. Additionally, the finder-of-fact could have concluded that the petitioners were not put on notice of a cause of action against the respondents based upon the conduct of the petitioners' tax lawyer, Burton, and the respondents, during and immediately following the tax litigation, having never notified the petitioners that they may have had a cause of action against Brown individually or Brown & Sturm. Moreover, the finder-of-fact must be able to consider the respondents' conduct at the time of the settlement with the IRS, having recognized that the petitioners were injured, yet persuading the petitioners that the sole source of their injury was a third party and recommending counsel to assist the petitioners in the pursuit of that party. Further, the finder-of-fact must be able to consider the silence of Hochberg as to existence or nonexistence of a cause of action against the respondent.

To be sure, the petitioners sought legal advice from four attorneys—Brown, Sturm, Burton and Hochberg—none of whom identified the respondents as potential malpractice defendants. All of the attorneys knew, or should have known, the facts and circumstances surrounding the initial tax advice and settlement, and all knew, or should have known, of the existence and content of Wolf's letter. Yet all of the attorneys directed their attention toward Wolf and Piper & Marbury as the direct and proximate cause of the petitioners' alleged harm. Quite clearly, reasonable minds could conclude that, to require the petitioners in this circumstance, while the respondents continued to represent them, not only to be suspicious of their lawyers, but to ferret out, by seeking yet more legal advice than that being obtained from Brown, Sturm, Burton and Hochberg, every possibility that their lawyers may have

---

"11. On numerous occasions, my wife and I and other members of the family spoke with Mr. Brown about developments in the case. In most, if not all, of these discussions, Mr. Brown assured us that there was nothing to worry about, that he was doing whatever was necessary to address the situation, and there would be no adverse tax adjustment arising from the sales transaction."

provided negligent advice, or that they were being defrauded, would amount to the exercise of extraordinary diligence, rather than that usually required, usual or ordinary diligence. See, e.g., *Herring*, 266 Md. at 600, 295 A.2d at 880.

A majority of the Court of Special Appeals in deciding, as a matter of law, that the petitioners were on inquiry notice before the dismissal of the malpractice claim against Wolf and Piper & Marbury, reasoned that the petitioners

> "cannot reasonably overlook or ignore that, almost from day one, they were alerted by a highly regarded estates and trusts attorney and a reputable law firm that the validity of appellees' tax planning was questionable."

\* \* \* \*

> "If Wolf's analysis were incorrect and the transaction was legitimate, as appellees advised, then a reasonable person should have wondered why appellees would fear the compromise of the defense based on a letter that was legally incorrect. Stated otherwise, if Wolf's view was wrong, as appellees had maintained, Wolf's letter should not have made a difference in defending what was cast by appellees as a legitimate transaction. Conversely, because Wolf's letter was of concern, that, too, should have alerted appellants."

\* \* \* \*

> "The size of the settlement is also a factor of some significance here. We recognize that, for any number of reasons, many cases are settled by payment from a party who is not necessarily culpable, or who does not believe he or she is actually liable. A $20 million settlement, however, is not of the kind or amount that is ordinarily paid without some genuine concern as to liability or wrongdoing. A settlement of that magnitude surely should have signaled to appellants that something may have been wrong with the underlying advice from appellees."

121 Md.App. at 403–404, 710 A.2d at 307. The intermediate appellate court also concluded that the petitioners created "a smoke screen" to ignore notice. *Id.* at 407, 710 A.2d at 309. Moreover, it believed that the petitioners should be charged with notice of the information in the letter from Beall, received by Hochberg and Brown, pointing out that the advice rendered by the respondents to the petitioners was flawed. *Id.* at 408, 710 A.2d at 309–310. We disagree with the reasoning and the conclusions of that court.

To reach the conclusion it did, the Court of Special Appeals made credibility determinations, which it then used in making, and to justify, its summary judgment analysis. In order for them to have been on notice for purposes of the discovery rule, the petitioners must have known, or at least have reason to believe the correctness of the advice Wolf and Piper & Marbury gave their parents and, conversely, to disbelieve, or at least suspect the accuracy, of that given by Brown. Under the court's analysis, the petitioners are required to have credited the Wolf and Piper & Marbury advice and rejected the advice from Brown. That must follow from the intermediate court's premise, that the former was necessarily correct and the latter was necessarily wrong. But, certainly, a finder-of-fact could conclude that, under the circumstances, it was reasonable for the petitioners to trust their attorneys, that the petitioners, in good faith, could believe their advice to be accurate, and, thus, reasonably reject that offered by Wolf. As we have seen, it is not the role of the trial court at the summary judgment stage to try the case, to resolve the ultimate issue of determining which of the parties is the wrongdoer. Rather, it is trial court's responsibility simply to determine whether there is a genuine dispute as to the material facts of whether the petitioners were on notice of the respondents' alleged wrongdoing and, if not, whether they acted with reasonable diligence to discover it, thereby appropriately pursuing their cause of action.

It is significant in this case that the IRS investigation of the transaction did not come as a surprise to the petitioners; they were advised by Brown that the IRS probably would investi-

gate but that, if investigated, the transaction would not result in the payment of additional taxes. Moreover, the five subsequent appraisals of the property at fair market value, including the appraisal conducted by Montgomery County, were notably less than that estimated by Wolf's "knowledgeable, experienced and responsible" source. In addition, the settlement with the IRS, which included penalties, also was appreciably less than Wolf's minimum estimated tax liability of over $27 million. Finally, the reason the respondents gave for recommending that the petitioners settle with the IRS, the negligence of Wolf and Piper & Marbury, was reinforced by Burton and Hochberg. Viewing these facts in the light most favorable to the petitioners, a trier of fact reasonably could conclude that the petitioners' reliance upon their lawyers was reasonable, that the attorneys provided a basis for crediting their conclusion that any blame for the $20 million in damages the petitioners suffered was solely attributable to the release of Wolf's letter.

Furthermore, it is also significant to the issue of fraud that the respondents consistently assigned blame to Wolf and Piper & Marbury and that they never shared with the petitioners the letter from Beall, which charged that the respondents provided negligent advice to the petitioners. Thus, a trier of fact could conclude, as to that issue, that the respondents were instrumental in deflecting responsibility away from themselves.

This Court should not, and will not, charge a complaining party with failure to search for a missing element of a cause of action if a diligent search would not have revealed it or there was no reason for that party to conduct the search. As we have seen, the existence of a continuous, fiduciary relationship permits a complaining party to trust, albeit not blindly, that such a relationship will not be violated and that the he or she receives will not be provided negligently. Under the facts of this case, there is no basis, except crediting one side over the other, thus, making a credibility determination, for disallowing the trust and confidence that the petitioners placed in their attorneys or attributing notice to them as a matter of law

simply because other attorneys, on the other side of the issue and acting in their self interest, expressed, even if strongly so, a contrary opinion as to the state of the law.

Finally, the intermediate appellate court improperly inverts the attorney-client relationship by charging the petitioners with greater knowledge of the law than their attorneys:

"A diligent investigation surely would have revealed that [the petitioners] could have asserted attorney-client privilege in the tax case to block the IRS from using Wolf's letter in the tax litigation, but apparently [the petitioners] failed to recognize that legal point."

121 Md.App. at 412, 710 A.2d at 311. This is utterly inappropriate.

First, the petitioners were represented by counsel, on whom they could, and should, rely to apprise them of their rights and to develop trial strategy. At the very least, however, reasonable minds could differ as to whether the petitioners, under the circumstances extant, should have discovered that they could have asserted the attorney/client privilege and thereby prevented the use by the IRS of the Wolf letter. Here, the petitioners alleged that they were kept in ignorance of their cause of action by the actions of the respondents, that they discovered the negligence and/or fraud when reading the opinion in *King v. Davis, supra,* that they did not discover it sooner because of the silence, and affirmative acts on the part of the respondents, and that they relied upon the fiduciary attorney-client relationship between themselves and the respondents and were not advised by Burton or Hochberg that they might have a cause of action against the respondents. A trier of fact could find from these facts, if established, that this is a sufficient basis to satisfy the requirements outlined in *Mettee v. Boone, supra,* 251 Md. at 338–339, 247 A.2d at 394 and *Piper v. Jenkins, supra,* 207 Md. at 319, 113 A.2d at 924. Further, a finder-of-fact could have concluded that Brown's failure to assert the attorney/client privilege to prevent use of the Wolf letter, while persisting in blaming any resulting damages on the release of the letter, was itself evidence of the

respondents' continuing concealment—whether negligently or fraudulently—of their initial negligence.

The respondents rely on *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421 (1969), *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972), and *Watson v. Dorsey,* 265 Md. 509, 290 A.2d 530 (1972), all involving allegations of professional malpractice, as support for their position. Because neither negligent nor fraudulent concealment was at issue in those cases, the respondents' reliance is misplaced.

*Feldman* was a professional malpractice action against an accountant for damages due to an assessment of penalties and interest by the IRS. 255 Md. at 289, 257 A.2d at 422. The issue that this Court addressed was whether the statute of limitations for such an action began to run. There, almost eight years after the alleged negligent act, Feldman, the owner of a furniture company, sued his former accountant for damages he alleged were caused by the accountant's failure to timely file forms with the IRS as to his election of sub-chapter S treatment for his small business. To qualify for that treatment, the necessary form had to be filed within 30 days prior to or after the beginning of the corporation's fiscal year. It was not disputed that the form was mailed between 7:00 p.m. and 9:00 p.m. on the 30 th day after the beginning of the corporation's fiscal year, but was postmarked the 31 st day.[18] Although notified by the IRS shortly after the filing of the untimeliness and thus the denial of the election, Feldman proceeded to file returns as if the election had been approved, claiming that he had been assured by the accountant that there was nothing to worry about. Subsequently, Feldman received a deficiency notice from the IRS, which he contested, pursuing the matter to decision in federal tax court. Only after that court held for the IRS did Feldman bring a tort action against his accountant.

---

**18.** The post office at which the form was posted followed a procedure whereby mail received the evening of one day was postmarked with the date of the following day.

The failure to file the forms in a timely manner, Feldman contended, caused damages in excess of $25,000 in back taxes, penalties, and interest. *Id.* at 290, 257 A.2d at 422. Contending that the statute of limitations began to run on the date the company's owner received the tax deficiency, rather than, as contended by Feldman, on the date that the tax court sustained the deficiency assessment made by the IRS, the accountant argued that the suit was time barred. The trial court rejected Feldman's theory. *Id.* at 290, 257 A.2d at 422–423. This Court affirmed, reasoning:

> "[F]ocusing attention on the date of July 22, 1964, when the appellant received the notice of the tax deficiency in the amount of $25,428.06 from the Appellate Division of the Internal Revenue Service, we are of the opinion that any reasonable and prudent man, being in the place of the appellants, would have known or certainly should have known at that time, that he had sustained legal harm as of that date, if not before. The appellants had by this time discharged the appellees as their accountants and they had known for over three and a half years that the Internal Revenue Service disagreed with their position. Certainly, when they received notice of the tax deficiency assessment on July 22, 1964, if they had not before, it became necessary for them to incur the expense of retaining legal counsel. We think, at the very least, from the date of this assessment of the tax deficiency by the Internal Revenue Service the statute of limitations began to run adversely to their action against their accounts."

*Id.* at 296, 257 A.2d at 426.

*Feldman* was, as is true of all cases, decided on the facts and circumstances presented in that case; it was not intended to set forth an ironclad rule for summary judgment in limitation of action cases. Notably, there are significant factual differences between this case and *Feldman.* While in *Feldman*, there was no dispute as to what the accountant had done, the effect of that action being the only matter in contention, in the case *sub judice*, it has always been hotly contested whether it was the respondents or Wolf and Piper &

Marbury who negligently advised the Kings. Moreover, unlike this case, the accountant in *Feldman*, aside from, at most telling Feldman, on one occasion, that he had nothing to worry about, was not actively involved in diverting Feldman's attention or hiding the problem. In fact, the Court in *Feldman* did not have to address whether the accountant acted negligently or fraudulently to conceal a cause of action because, as it noted, the accountant had been discharged after the act which caused the alleged damage. *Id.* at 296, 257 A.2d at 426.

In *Leonhart*, Leonhart & Company, a reinsurance firm, was advised by its accountant to change its accounting method. Although the company accepted that advice, the accountant did not adhere to the regulations of the Internal Revenue Service which required obtaining prior consent before such a change could be made. Subsequently, the company received notice from the IRS first that the change in accounting method was not approved and later of a substantial tax deficiency assessment. The company challenged the tax deficiency assessment to judgment in the United States Tax Court. That challenge being unsuccessful, it appealed to the United States Court of Appeals, again unsuccessfully. Unlike in *Feldman*, during the entire time that this issue was being litigated, the accountant continued as the company's accountant and repeatedly gave assurances that the IRS's position was incorrect and continued to represent the company on accounting matters. 265 Md. at 222, 289 A.2d at 3. Moreover, the accountant defended its professional advice to the company, advised the company to fight the case in tax court and even recommended legal counsel. When its challenge to the IRS assessment failed, the owners of the company, the Leonharts, turned to the accountant for relief and filed a professional malpractice action against their accountant for failing to obtain the required permission from the IRS before changing accounting methods. By this time, however, the three-year statute of limitation had run and the trial court granted the accountant's motion for summary judgment. This Court affirmed.

Different from the present case, the Leonharts did not allege that their accountant acted negligently or fraudulently to prevent discovery of a cause of action. There, just the opposite occurred, they "conceded that there was no fraud or concealment in the accountant's actions." *Id.* Indeed, this Court in *Leonhart* was clear in noting that the issue of fraudulent concealment was not properly before the Court. We explained:

"[A]ppellants conceded that Atkinson practiced no fraud or concealment, so the beginning date of limitations is not postponed by § 14.[19] Even without this concession appellants cannot succeed under that section since their replication does not affirmatively allege the following: (i) that they were kept in ignorance by the fraud of an adverse party that they had a cause of action; (ii) how, if fraud existed, they discovered it; (iii) why they did not discover it sooner; and (iv) what diligence they exercised to discover it. *Mettee v. Boone,* 251 Md. 332, 339, 247 A.2d 390 (1968); *Piper v. Jenkins,* 207 Md. 308, 319, 113 A.2d 919 (1955)."

265 Md. at 227, 289 A.2d at 6. Instead, the Leonharts relied almost exclusively on the doctrines of waiver and estoppel. Rejecting that reliance, the Court stated:

"The appellants seemingly are attempting to raise a § 14 defense to a plea of limitations under the guise of equitable estoppel and waiver, by claiming reliance on [the accountant]'s repeated assurances that his advice was correct. In their brief the Leonharts argue that [the accountant] ought to be prohibited from using the statute as a bar since his conduct 'obscure(d) [their] perception of the wrong or prevent(ed) discovery' of it. Here, [the Leonharts] have not alleged anything tantamount to constructive fraud, nor have

---

**19.** Maryland Code (1957, 1972 Repl.Vol.) Article 57, § 14 is the predecessor of § 5-203 of the Court and Judicial Proceeding Article. That section provided:

"In all actions where a party has a cause of action of which he has been kept in ignorance by the fraud of the adverse party, the right to bring suit shall be deemed to have first accrued at the time at which such fraud shall or with usual or ordinary diligence might have been known or discovered."

they demonstrated that [the accountant] has been guilty of 'any unconscionable, inequitable or fraudulent act of commission or omission upon which (another) relied and has been misled to his injury.' *Jordan v. Morgan, Adm'x,* 252 Md. 122, 132, 249 A.2d 124, 129 (1969). We do not think [the Leonharts] have alleged facts from which waiver or estoppel could be found. All they have shown is that after [the accountant] erroneously advised them, he continually maintained his position and recommended that the matter be pursued in the tax court. It was not alleged that the accountant at any time asked the Leonharts to forbear bringing suit against him. It was also not alleged that [the accountant] indicated he would waive the defense of limitations should the [the Leonharts] later make a claim, or that he induced them not to file suit by giving assurances that he would settle any claim they might make."

*Id.* at 227–228, 289 A.2d at 6.

As in *Feldman,* in *Leonhart,* there was no conflict of advice between parties whose function it was to give advice. Nor was there an issue concerning the act or omission constituting the professional malpractice, and it was not alleged that the accountant did some act that had the effect of preventing discovery of the accountant's malpractice. Instead, it was alleged only that the accountant's initial advice was wrong and that the mere continuing professional relationship should toll the statute of limitations, a position that the Court rejected. *Id.* at 222, 289 A.2d at 3.

The factual posture of this case is significantly different. At issue here is the correctness of advice given by attorneys, hired for that purpose, the rationality of a client's reliance on counsel's advice in the course of litigation and, perhaps at stake is the viability of the attorney/client privilege. It is clear, moreover, that the present action is not confined to the initial advice given, but also extends to the failure of the respondents, whether by negligence or fraud, to advise their clients, the petitioners, adequately, including as to the parties to whom the petitioners may have been able to look for recovery of the damages that they sustained.

To be sure, an independent attorney, consulted for the purpose of evaluating the facts surrounding the land transfer at issue in the case *sub judice* to determine whether there was a cause of action, and, if so, against whom, should have considered and included the respondents among those against whom the petitioners may have had a claim for professional malpractice. If that attorney failed to include the respondents, whether negligently or fraudulently, or allowed the statute of limitations to run, he or she would be liable for the damages proximately caused thereby.[20] That being the case, it follows, and would be illogical to conclude otherwise, that a rational jury could have concluded that the respondents, who maintained an attorney-client relationship with the petitioners from 1981 to 1994, took advantage of the confidential relationship they had with the petitioners by failing to inform them of their potential liability, thereby preventing or delaying discovery of the respondents' initial alleged negligence, despite the petitioners exercise of ordinary diligence.

*Watson v. Dorsey,* an attorney malpractice action, likewise did not involve the issues of negligent or fraudulent concealment. There, Dorsey represented Mr. and Mrs. Watson in an ejectment case. In preparation for trial, the Watsons provided Dorsey with the names of witnesses and proffered the testimony to be offered by those witnesses. Dorsey, however, did not call the witnesses at trial. The Watsons lost their case and, on appeal, this Court affirmed. The Watsons subsequently sued Dorsey, alleging that he negligently failed to call certain witnesses at trial which resulted in their sustaining damage. Holding that the Watsons' malpractice action was barred by the statute of limitations, the trial court found that the statute of limitations began to run on the date that the Watsons lost their ejectment case, not the date that the judgment was affirmed on appeal. After evaluating the na-

---

**20.** Ironically, the majority of the Court of Special Appeals notes that the petitioners may have a separate claim against Hochberg, 121 Md.App. at 409 n. 8, 710 A.2d at 310 n. 8, yet it fails to recognize the potential cause of action against the respondents.

ture and circumstances of the complaint and weighing the facts particular to that case, we stated:

"It is clear to us that the nature of the Watsons' complaint against Dorsey makes it plain that they must be charged with knowledge that they had been wronged as soon as the ejectment case was decided against them. They felt that certain witnesses could testify as to certain things (which they enumerated to the lawyer) that would be favorable to their cause. Their lawyer did not call those witnesses and they lost their case.

"The connection between the failure to produce their witnesses and the loss of the case could not have failed to come into their consciousness immediately. Whether in fact there was a connection would seem to be at least open to doubt; but they must at once have thought that the failure to produce the testimony they told the lawyer was so important was a cause, and the loss of the case an effect. Yet they did not sue their lawyer until 45 months had passed, and the law required them to sue within 36 months.

"The Watsons urge upon us that Dorsey continued to be their lawyer until after the ejectment case was affirmed by the Court of Appeals on June 3, 1968, that there was a relationship of trust and confidence between clients and lawyer and that it is unreasonable in this situation to say that the clients should sue the lawyer until the last available court has spoken. We agree that conceivably there may be situations of client and lawyer relationship where the client did not discover or could not reasonably have discovered during the continuation of the relationship that he had been wronged, but this case is not one of them. The basic test of the discovery rule consistently is the 'knew or should have known' test and the Watsons certainly should have realized the simple and obvious connection (if connection in fact there was) between the absent witnesses and the loss of the case."

*Id.* at 513, 290 A.2d at 533 (emphasis added).

In *Watson,* as in *Feldman* and *Leonhart,* there was no controversy concerning the act or omission constituting the

malpractice. Moreover, the Watsons knew not only the act that the attorney did not perform, but fully its significance, perhaps better than the attorney. Thus, the Watsons did not argue that they lacked sufficient information to discover their cause of action; rather, they argued that, irrespective of whether they knew or should have known, this Court should rule in their favor based upon the relationship of trust and confidence that existed between the parties, and that "Dorsey should be estopped to claim that their cause of action accrued before ... the Court of Appeals ruled, because he continued as their lawyer until that time." *Id.* at 514, 290 A.2d at 533–534. As we have seen, if the confiding party acquires actual knowledge during the existence of the confidential relationship that the confidential relationship has been abused, or comes into possession of facts which put him or her upon inquiry notice, which, if pursued, would have disclosed the abuse, the statute of limitations begins to run. It is significant that the Watson's did not allege fraud or that their attorney negligently encouraged forbearance to sue by pursuing a baseless appeal or directing blame at a third party. *Id.* at 513–514, 290 A.2d at 533.

## IV.

Finally, the petitioners argue that the Court of Special Appeals erred in affirming the circuit court's grant of summary judgment on the grounds that the contract claim was barred by limitations, and the equitable claim, seeking rescission of the Retainer Agreement and the Addendum, was precluded by laches. We agree with the petitioners.

Laches is an equitable doctrine, which applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party. *Inlet Assoc. v. Assateague House Condominium Ass'n,* 313 Md. 413, 438–439, 545 A.2d 1296, 1309 (1988). When a case involves concurrent legal and equitable remedies, "the applicable statute of limitations for the legal remedy is equally applicable to the equitable one." *Schaeffer v. Anne*

*Arundel County,* 338 Md. 75, 81, 656 A.2d 751, 754 (1995) (citations omitted). Whether a delay in asserting rights constitutes laches usually depends on whether the delay was reasonable under the circumstances and, where a person is guilty of unreasonable delay, a court will not give its aid. *See, e.g., Coudon v. Whitaker,* 133 Md. 482, 105 A. 734 (1919). For a delay to constitute laches, the delaying party must have had notice of a right or cause of action. Therefore, laches cannot be imputed to a party who, through no fault of his or her own, is ignorant of facts giving rise to a cause of action and has, as a consequence, failed to assert it. *See, Berman v. Leckner,* 193 Md. 177, 185, 66 A.2d 392, 395 (1949).

■ In the case *sub judice,* having concluded that an issue of fact exists as to whether the petitioner had notice of a malpractice cause of action or fraud on the part of the respondent, we hold that the trial court inappropriately applied the doctrine of laches.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.*

WILNER, Judge, Dissenting.

With respect, I dissent. Sweeping aside as though irrelevant or unimportant all of the stark facts to the contrary, the Court concludes that "on the record in this case, a finder-of-fact could conclude that it was reasonable for the petitioners, untrained in the law and relying on the fiduciary relationship with their attorneys, to have failed to discover their cause of action against the respondents." On the record in his case, it seems to me, it was about as reasonable for petitioners, after December, 1988, to continue to rely on Brown's advice and

assurances as it would have been for a passenger on the *Titanic*, observing the ship plunging into the sea, to remain convinced that all was well.

Under the "discovery rule," a cause of action accrues "when the wrong is discovered or when with due diligence it should have been discovered. *Poffenberger v. Risser*, 290 Md. 631, 634–35, 431 A.2d 677, 679 (1981). That rule, we further held, "contemplates actual knowledge—that is express cognition, or awareness implied from 'knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued.'" *Id.* at 637, 431 A.2d at 681 (alteration in original) (quoting *Blondell v. Turover*, 195 Md. 251, 257, 72 A.2d 697, 699 (1950)). I agree with the Court's view that, when the parties are in a confidential relationship, the confiding party "is under no duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious." My disagreement is not so much with the statement of the law as with its application in this case. It was more than "something" that occurred that should have made petitioners suspicious; it was a whole series of things, culminating in the events of December, 1988.

Petitioners were on notice from the very beginning that Brown's scheme was possibly flawed. They were aware of Mr. Wolf's deep concern, and even the accountant, Bonsal, warned them of "possible tax consequences." They had every right, *at that time,* to regard Mr. Wolf's warnings as merely a difference of professional opinion and to proceed in accordance with Mr. Brown's advice, but they at least were aware that a highly qualified attorney believed that the scheme was flawed, that it likely would be challenged by IRS, and that, if challenged successfully, they would be subject to a substantial tax and penalty. Even when, as Mr. Wolf, and Mr. Brown, predicted, IRS did challenge the scheme, petitioners probably had the right to rely on Mr. Brown's assurance that all would be well in the end. At least, a jury could find that to be so.

When, in a complete turn-about, however, Brown advised petitioners to throw in the towel and settle for $20 million, half of which was in penalties, their continuing blind faith in him for another six-and-a-half years is simply inexplicable.

Petitioners are not unsophisticated, uneducated people. They are affluent individuals who obviously had lawyers and accountants at their command. They were privileged, of course, at their risk, to remain in a state of denial and accept Brown's statement that their position was prejudiced only by IRS's possession of Wolf's letter, but to hold that they were not, as a matter of law, on inquiry notice at that point strikes me as wholly unwarranted. This is not a credibility issue— who one believes. The test is an objective one—what would a person of ordinary prudence be expected to do when undisputably aware of these uncontradicted facts? Petitioners, who had been warned at the outset that the scheme was flawed, had just seen it collapse. Instead of making an independent, objective inquiry into Brown's excuse that Wolf was at fault, they blindly followed Brown's recommendation that they hire another lawyer to sue Wolf. It is not entirely clear from this record how IRS came into possession of Wolf's letter, but, however that occurred, it now seems to be accepted that the letter would have been inadmissible against petitioners, which presumably any competent attorney would have told petitioners had they inquired. If petitioners had consulted counsel in that regard and been so informed, they would certainly have had a basis not only to question Brown's assertion that the need to settle was prompted by Wolf's letter but to question as well virtually everything he had told them.

To me, on this record, the Court's conclusion constitutes an unwarranted extension of the discovery rule. I would affirm the judgment of the Court of Special Appeals.

Judge RODOWSKY has authorized me to state that he joins in this dissenting opinion.